James E. SWANN et al., Plaintiffs,

v.

The CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, a public body corporate, Defendant.

Civ. No. 1974.

United States District Court
W. D. North Carolina,
Charlotte Division.

July 14, 1965.

J. LeVonne Chambers, Charlotte, N. C., Derrick Bell, New York, N. Y., for plaintiffs.

Brock Barkley, Charlotte, N. C., for defendant.

CRAVEN, Chief Judge.

■ This is another school case. Our adversary system of justice is not well-adapted for the disposition of such controversies. It is to be hoped that with the implementation of the 1964 Civil Rights Act the incidence of such cases will diminish. Administrators, especially if they have some competence and experience in school administration can more likely work out with School Superintendents the problems of pupil and teacher assignment in the best interests of all concerned better than can any District Judge operating within the adversary system. The question before this court, even within its equitable jurisdiction, is *not* what is best for all concerned but simply what are plaintiffs entitled to have as a matter of constitutional law. What *can* be done in a school district is different from what *must* be done.

During March, 1965, the Charlotte-Mecklenburg Board of Education proposed a plan to comply with the constitutional mandate embodied in Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873, 38 A.L.R.2d 1180. On April 11, 1965, the Board resolved as follows: "Resolved by the Charlotte-Mecklenburg Board of Education that, in recognition of the requirements of law, the development of a policy be undertaken looking to the ultimate employment and assignment of all staff and professional personnel without regard to race or to factors other than training, competence and fitness." During the trial counsel for the School Board, the Chairman of the Board, and the Superintendent of Schools modified the proposed plan of March 11 to include in it the resolution with respect to teachers and staff set out hereinabove.

Plaintiffs' complaints with respect to the plan as modified are:

(a) Certain school districts have been gerrymandered to prevent the mixing of the races in the schools;

(b) There are no administrative problems sufficient to justify the proposed delay in geographical zoning of ten schools which are excepted from the plan;

(c) The above quoted amendment with respect to desegregation of teachers and staff looks to the far distant future and ought to be effective at once.

Most of the testimony at the trial, lasting a day and a half, dealt with alleged gerrymandering and the excepted schools. The testimony and the subject matter is exceedingly complex. This is not a simple school system. There are 109 schools in the district. On June 2, 1965, the Board sent a notice to the parents and/or guardians of every child in the system assigning the children in 99 schools according to geographical zones. In addition each parent was advised that any child, without regard to race, and without regard to minority or majority of race in any particular school, might freely transfer to another school of his choice. In summary, with respect to the 99 schools, and excepting 10 schools, all the children were assigned according to their place of residence in a geographical zone, and *all* children were accorded the privilege of transferring to another zone—without the necessity of giving any reason for the requested transfer. The privilege of free transfer extended to the children in the excepted schools.

By reason of geography, it happened that 1,955 Negro children were initially assigned to schools largely populated by white children (hereinafter called for convenience "integrated" schools). In addition, 262 Negro children elected to transfer from schools entirely or almost entirely populated by Negro children (hereinafter called for convenience "Negro" schools), making a total of 2,217 Negro children being assigned, either initially or by reason of transfer, to integrated schools. However, 91 of these Negro children elected to be reassigned to a Negro school so that there now remain for the school year beginning September, 1965, approximately 2,126 Negro children in 43 integrated schools in the system. One school is racially "bal-

anced", i. e., about one-half white and one-half Negro.

Approximately 396 white children, under the geographical plan, were initially assigned to Negro schools. All, or practically all, of them requested transfer and were transferred out of the Negro schools to an integrated or white school.

There are about 75,000 children in the entire system. Over the last several years enrollment has increased approximately 3,000 children per annum, requiring the addition of approximately 70 classrooms each year. Thirty million dollars has been spent or committed in a period of approximately five years for new construction. Racially, about 52,000 are white children and the remainder are Negro.

## Excepted Schools

 The 10 schools excepted from the plan are Negro schools. Several new schools in the area of the excepted schools are being built and are expected to be completed by September, 1967, and most probably by September, 1966. Until these new schools are available the 10 excepted schools cannot be permanently rezoned. If the Negro children in these 10 schools were incorporated into the geographical zone plan now most of them would have to be assigned to yet another school next year or the year after. In the opinion of the Board multiple assignment changes are disruptive to the child and the school administration. It takes time to appraise and evaluate schools and their proper locations, and thereafter to intelligently determine upon abandonment, restoration or replacement of a given school. It does not seem unreasonable, in view of the complexity of the entire system, to approve a maximum delay of two years and a probable delay of only one year for the purpose of making these difficult determinations and to facilitate a degree of permanence in the rezoning to be achieved. Lacking special competence and experience in public education, it would be presumptuous for a District Judge to brush aside the determination of these problems by the Board and its staff, absent a clear showing of an arbitrary refusal to grant plaintiffs their constitutional rights. There is no such showing. The Board is just as determined as are plaintiffs that the 10 schools will be incorporated into a geographical plan. The disagreement is only as to *when*. It is not suggested that the right granted to the Negro children in the 10 excepted schools to request transfer out of those schools is a sufficient compliance with the constitution. A freedom of choice plan in order to be constitutional must include correctives at the time of initial assignment. This, however, is only an interim plan and for a very short period—probably only a period of one year with respect to most of the schools. The exception of the 10 schools will be approved in accordance with the plan but without prejudice to the right of plaintiffs to renew their motion next summer and to request re-examination at that time of the progress made.

## Gerrymandering

██ The gerrymandering contention is exceedingly intricate and complex. Plaintiffs' expert witness (Mr. Louis Kramer) necessarily testified abstractly from a study of the plan and the maps available to him and without personal knowledge of the Mecklenburg terrain. He was commendably candid in stating that he had not spent enough time to be able to recommend generally a new and better zoning pattern. If Mr. Kramer, competent and experienced in the field of education, does not feel able to intelligently alter the general zoning pattern, it seems unlikely to me that a District Judge could intelligently do so based upon information made available to him in only a day and a half. Even so, Kramer's testimony with respect to particular schools has been carefully considered and compared with the testimony of Dr. A. Craig Phillips, Superintendent of Schools. The maps have also been studied with respect to the allegations of gerrymandering and the limited testimony in support thereof. It is fair to

say that most of Kramer's testimony is ad hoc: The results with respect to mixing of the races are assumed to be intentional where little mixing occurs. But there is no testimony tending to show that boundary lines were chosen for the purpose of diminishing integration—unless it be assumed that the result proves the unlawful intention. I am unwilling to make the assumption.

Kramer testified with respect to gerrymandering about Lakeview Elementary School, Thomasboro Elementary School, Paw Creek Elementary School, Ashley Park Elementary School, Barringer Elementary School, Newell Elementary School, Eastover Elementary School, Berry Hill Elementary School and Billingsville Elementary School. With respect to many of these schools, notably Thomasboro, Paw Creek, Ashley Park, Newell, Eastover and Berry Hill, changing the line questioned by the expert witness would not result in a greater mixing of the races but instead would merely throw certain students into another similar zone with respect to racial composition. The objections to these lines are irrelevant. For example, in Thomasboro, Paw Creek and Ashley Park, enlarging the zones in accordance with the contention of plaintiffs and the testimony of Mr. Kramer would not increase the number of Negroes in these schools *until* the excepted schools are incorporated into the zoning plan. For another example, changing the line of Eastover Elementary School in accordance with Mr. Kramer's testimony would result simply in putting a few more white students in the already heavily white Elizabeth zone.

■ As a general proposition, it is undoubtedly true that one could deliberately sit down with the purpose in mind to change lines in order to increase mixing of the races and accomplish the same with some degree of success. I know of no such duty upon either the School Board or the District Court. The question is not whether zones can be gerrymandered for the assumed good purpose of racial mixing, but whether gerrymandering occurred for the unconsti-

tutional purpose of preventing the mixing of the races. I am unable to find from the evidence a sufficient showing of the unconstitutional purpose with respect to any school zone. The strongest case of plaintiffs is that of Billingsville zone. This is a zone which embraces a Negro housing pattern almost exclusively. Only six white children reside within the zone. Mr. Kramer insisted that the southern boundary line should be moved south to McAlway Road and that the effect of the present line is to keep Negroes out of the Cotswold School. But the testimony plainly discloses that the southern line follows the new Belt Road surveyed route and that the streets in the Cotswold area dead-end at the boundary line and do not cross into Billingsville. The southern boundary, therefore, follows a natural geographical "buffer" zone between Cotswold and Billingsville. This is a housing pattern, and however unfortunate its existence may be, the fact remains that it does exist. To reiterate, the question before the District Court is *not* whether a "better" zone might be established but simply whether the zone which was established is an arbitrary and unreasonable one based on race and without regard to natural boundary lines. Thus far it has not been held unconstitutional to assign children to a school on the basis of their residences in a cohesive and contiguous geographical area. The Board has done better than might be required in that it has allowed free transfer out of Billingsville to those Negro children who wish it. Cf. Taylor v. Board of Education of City School District of City of New Rochelle, D.C.S.D.N.Y., 191 F.Supp. 181; Taylor v. Board of Education of City School District of City of New Rochelle, D.C. S.D.N.Y., 195 F.Supp. 231; Taylor v. Board of Education of City School District of City of New Rochelle, 2 Cir., 294 F.2d 36.

■ Considering all of the testimony I am unable to find from the evidence and by its greater weight that any of the geographical zones for the 99 schools incorporated in the plan have been gerry-

mandered for the purpose of avoiding the constitutional mandate and I fail and refuse to so find.

Many of the gerrymandering complaints of plaintiffs will be minimized when the other 10 schools are incorporated into the zoning system. Probably, when this is done, the initial assignments of Negroes to integrated schools will about double. There are about 4,000 Negroes in the excepted schools and it is contemplated that about half of them will, next year or the year after, be initially assigned to integrated schools. Indeed, Mr. Kramer testified that the gerrymandering complaints relate entirely to schools that will be affected or are now affected by the status of the excepted schools except for five, i. e., Eastway Junior High School, Hawthorne Junior High School, Billingsville Junior High School, Barringer Elementary and Wilmore Elementary.

Derita Elementary School is said to be gerrymandered because the zone is cut in two by I–85. But this problem is related to the excepted schools and the Board intends to rezone next year when the new school at Hidden Valley is completed.

### Assignment of Teachers and Staff

 The amendment to the plan with respect to assignment of staff and professional personnel is acceptable except with respect to when it shall be accomplished. The word "ultimate" contained in the resolution is disapproved and the Board will be directed to substitute in the resolution the word "immediate". In this connection it is worthwhile to quote from the opinion of Chief Judge Haynsworth in Bradley v. City of Richmond, 4 Cir., 345 F.2d 310, 1965: "When all direct discrimination in the assignment of pupils has been eliminated, assignment of teachers may be expected to follow the racial pattern established in the schools."

It is especially difficult to determine in a judicial process the state of mind of an individual. The difficulty is multiplied by the number of members of the School Board and the administrative staff participating in decisions. Yet the attempt must be made to appraise the overall purpose of the Board with respect to its constitutional duty. Reference has already been made to much of the evidence said to indicate bad faith. This is counterbalanced by the record of this Board of Education, certainly since the superintendency of Dr. Phillips beginning in 1962. Since then much progress has been made in integrating school activities and faculty meetings. For the first time this year a joint and mixed baccalaureate service was held for graduating high school seniors. The photographs offered in evidence illustrate the testimony of interracial activity in the administration of the school system. It is perhaps worth noting that the Board has determined to zone the Crestdale Negro School geographically over the opposition of the Negro committeemen and parents in that school who would prefer to keep it segregated. This does not sound like a School Board bent upon maintaining a segregated system. It is also worth noting that Morgan Elementary School was previously a Negro school deliberately gerrymandered under the former and now unlawful dual attendance zone system to keep out white children so as to separate the races, and that that has now been changed. The Board has now straightened the line to follow natural boundaries with the result that 65 white children were initially assigned to this previously all Negro school. This is scarcely consistent with the unsupported contention that this is a School Board determined to perpetuate unconstitutional segregation.

I accept the testimony of Mr. David W. Harris, Chairman of the Board, that the zones are determined by (1) the location of the schools and (2) housing patterns, and that this was done without regard to race. In evolving its plan, the Board sought and obtained the advice and counsel of Inglehardt, Inglehardt and Leggett. Plaintiffs' expert witness admits that this firm is competent and expert in the field of educational consultants.

Considering all of the evidence, it is concluded that the plan proposed by the Board, as amended to incorporate the policy with respect to teachers and staff, is a sufficient compliance with the duty

imposed upon the Board by the constitution as interpreted in Brown v. Board of Education of Topeka, Shawnee County, Kansas, supra, and subsequent decisions. The plan will be approved verbatim except for the change hereinabove indicated with respect to teachers and staff.

It is a temptation to afford to the 4,000 Negro students in the excepted schools yet another opportunity to request transfer to a school of their choice. The School Board itself allowed these children 28 days within which time to request transfer. At the trial the following colloquy occurred in open court:

COURT: "Is it fair to say that the plaintiffs do not ask the Court for that type of interim relief, namely, to order further freedom of choice for the students in the 10 excepted schools?"

MR. BELL: "I would think that in view of all of the testimony that that would be fair for the Court to conclude. We are more interested in having the schools included within the general zoning."

I hesitate to confer a benefit which is not sought.

An appropriate judgment will be entered approving the plan.