Josephine GOSS et al.

v.

**BOARD OF EDUCATION OF the CITY OF KNOXVILLE, TENNESSEE, et al.**

Civ. A. No. 3984.

United States District Court
E. D. Tennessee, N. D.

Aug. 19, 1960.

Carl Cowan, Knoxville, Tenn., Z. Alexander Looby, Nashville, Tenn., Jack Greenberg, New York City, for plaintiffs.

S. Frank Fowler, Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

This suit was filed by a number of Negro children and their parents or guardians against the Members of the Board of Education of the City of Knoxville, namely, John H. Burkhart, Robert B. Ray, Roy E. Linville, Charles R. Moffett and Mrs. Gilmer H. Keith, and also the Board of Education of the City of Knoxville, the School Superintendant and the persons who were either actual principals or acting principals of East High School, Park Junior High School, Mountain View Elementary School and Fulton High School in Knoxville, Tennessee, the Supervisor of Child Personnel Department, said defendants being the administrative officers having general supervision and control of the public schools of Knoxville, asking for an injunction restraining defendants from operating a compulsory racially segregated school system in Knoxville and for a declaratory judgment, declaring the rights of plaintiff school children to be admitted to the public schools of Knoxville on a racially unsegregated basis and without discrimination on account of race or color.

The defendants by answer admitted that the public schools were operated on a segregated basis, as had been the practice and custom in the Knoxville area since 1870.

The answer asserted that "Two duties of these defendants, have sharply clashed, the one to obey the Constitution of the United States as so recently interpreted, the second to honor and respect an allegiance to our community and its members which incorporates in its very fabric a careful protection of our cherished institutions. More particularly, there is the absolute compulsion to seek ever for efficient, undisturbed and continuous schooling, unmarred by the possibility of interruption from drastic unpopular change. The defendants have simply discharged the responsibilities of their offices in the only way that a proper reconciliation of conflicting allegiances has permitted. * * * "

In short, the position of the Members of the School Board was that the interest of the community demanded postponement of desegregation until a plan could be perfected that would fit the needs of the community.

The suit arises under the Constitution of the United States and seeks the enforcement of rights guaranteed by the Fourteenth Amendment. Jurisdiction is derived from Title 28 U.S.C., § 1343. The Court has jurisdiction of the parties and the subject matter. Title 28 U.S.C. §§ 1331, 2201, 2202.

The action was filed as a class action under Rule 23(a) (3) of the Federal Rules of Civil Procedure, 28 U.S.C.

The parties stipulated many facts, many of which are included below in this memorandum opinion.

Plaintiffs are Negroes and are citizens of the United States, State of Tennessee and are residents of and domiciled in the City of Knoxville, Knox County, Eastern Division of Tennessee. Adult plaintiffs, not applicants, are either parents or guardians of the infant plaintiffs who are applicants.

All infant plaintiffs are attending public schools operated by the City of Knoxville, except that infant plaintiffs, Blake, Robinson, Jr., Riddle and Thompson, graduated from Austin High School on May 31, 1960.

Defendant, Board of Education, operates the public elementary and secondary schools, including those now designated as Mountain View Elementary, Park Junior High, East High and Fulton High Schools, exclusively for the education and use of white children residing in the City of Knoxville. These schools are attended exclusively by white children and admittance thereto was denied to the infant plaintiffs and other Negro children similarly situated who reside in the areas proximately surrounding said schools, solely because of their race or color. The defendant, Board of Education, maintains and enforces a policy and practice of compulsory racial segregation throughout the Knoxville School System.

Fulton High School, in addition to providing the usual high school courses,

affords adequate facilities to provide technical and vocational instruction on a modern basis by grades. It is used by white children residing in the City of Knoxville, Tennessee who desire and are qualified to take said technical and vocational instruction, irrespective of their place of residence in the City of Knoxville; but the facilities afforded by Fulton High School are denied by defendants to infant plaintiffs who desire instruction, and other Negro children similarly situated, residing in the City of Knoxville, irrespective of their place of residence in the City of Knoxville, solely on account of their race or color.

The School System of Knoxville consists of 40 schools, total enrollment of 22,448 students, of whom 4,786 are Negro students and 17,662 are white students, as at the close of school June, 1960. On that day, the Knoxville School System employed a total of 879 principals and teachers, 712 of whom are white persons and 167 are Negroes.

The enrollment in the first grade of the Knoxville Public School System was approximately 2,314 students and 2,500 are anticipated in the first grade for the year beginning 1960, of whom approximately 1,900 are anticipated to be white students and 600 Negro students. Teachers employed for the first grade, year 1959–1960 of the Knoxville School System numbered 84, of whom 63 were white persons and 21 were Negroes.

Insofar as quality of teaching is concerned, the Public Schools of Knoxville operated for Negro students are substantially equal to the Public Schools of Knoxville operated for white students.

There is no difference in the salary schedules of Negro teachers and white teachers.

The physical facilities for white and Negro students are excellent.

Beginning with the year 1954 and continuing from time to time to the filing of the present suit, Negro parents and children and other citizens have petitioned the School Board and appeared before the School Board and asked the Board to take immediate action towards desegregation of the Public School System.

On June 16, 1955, the Attorney General of Tennessee rendered an opinion to the State Commissioner of Education, and through him to the Superintendant of Education for the State of Tennessee, in which he stated in substance that under the Tennessee Code it is the responsibility of each local school board to determine for itself the way in which it will meet the problems of desegregating the schools under its jurisdiction. As a result of this opinion, together with the decision of the United States Supreme Court in the Brown case, the Board in a special meeting held on August 17, 1955 resolved that it would act in good faith to implement the constitutional principles declared in the Brown decision as applied to public schools, and would make a prompt and reasonable start towards those objectives.

The Superintendant and his Administrative Staff were instructed to develop a specific plan of action leading to the gradual integration of the Knoxville public schools.

At a special meeting held on August 17, 1955, following the second Brown decision of May 31, 1955, the Board reaffirmed its policy to work towards gradual desegregation.

Two Members of the Board and two Members of the Supervisory Staff visited the integrated public schools of Evansville, Indiana in July, 1955 to study desegregation in those schools.

On August 17, 1955 the Board directed the Superintendent and his Staff to develop a plan of action leading to the gradual integration of the public schools and to that end the Superintendent and his Staff began holding meetings for the purpose of further exploring the subject. As an outgrowth of these meetings, the study council, composed of all principals, school administrators and supervisors (both white and Negro) and the Superintendant of Schools, was formed for the purpose of exploring and studying plans and procedures in school de-

segregation. This study council held an additional series of meetings and formulated several possible plans for desegregation, eight of which were presented to the Board for the Board's study. These study groups continued with their meetings the remainder of 1955 and during the year 1956.

In the meeting of May 11, 1956, the Board announced that each of the eight plans for desegregation had been carefully reviewed by the Board but that the Board did not feel at that time that desegregation of the Knoxville public schools could be successfully put into operation. Three reasons were given for such action:

(a) Segregation should not be attempted until the school building program is further advanced.

(b) The Members of the Board do not believe that the people of both races are ready for a definite plan for desegregation and that further delay would lessen the likelihood of unpleasant incidents which have occurred in some places where desegregation has been inaugurated.

(c) Before any plan for desegregation is put into effect, further studies should be made of the subject, and plans further developed that the children of both races will not be handicapped by a radical change in their classroom life.

During the week of August 27, 1956, serious trouble developed in Anderson County, Tennessee in the integration of the Clinton High School. This trouble produced several tense hearings and trials in this Court. In September, 1957, a Nashville, Tennessee elementary school was bombed and severely damaged. On October 5, 1958, Clinton High School in Clinton, Tennessee was bombed causing damage estimated at $250,000 to $300,000.

A hearing was held by this Court on February 8, 1960 on plaintiffs' motion for a preliminary injunction prohibiting the defendants from refusing to admit or transfer the infant plaintiffs to the schools to which they had applied for admittance on account of their race or color and for the declaratory relief sought in the complaint. At this hearing, defendant, Board of Education, agreed that it would submit a plan for desegregation on or before April 8, 1960. Action on other phases of the relief sought in the complaint was postponed, pending the submission of the plan.

On April 8, 1960, the Board filed the following Plan, which is sometimes referred to as Plan Nine:

"1. Effective with the beginning of the 1960–61 school year racial segregation in Grade One of the Knoxville Public Schools is discontinued.

"2. Effective for 1961–62 school year racial segregation shall be discontinued in Grade Two and thereafter in the next higher Grade at the beginning of each successive school year until the Desegregation Plan is effected in all twelve grades.

"3. Each student entering a desegregated grade in the Knoxville Public Schools will be permitted to attend the school designated for the Zone in which he or she legally resides, subject to regulations that may be necessary in particular instances.

"4. A plan of school zoning or districting based upon the location and capacity (size) of school buildings and the latest enrollment studies without reference to race will be established for the administration of the first grade and other grades as hereafter desegregated.

"5. Requests for transfer of students in desegregated grades from the school of their Zone to another school will be given full consideration and will be granted when made in writing by parents or guardians or those acting in the position of parents, when good cause therefor is shown and when transfer is practicable, consistent with sound school administration.

"6. The following will be regarded as some of the valid conditions to support requests for transfer:

"a. When a white student would otherwise be required to attend a school previously serving colored students only;

"b. When a colored student would otherwise be required to attend a school previously serving white students only;

"c. When a student would otherwise be required to attend a school where the majority of students of that school or in his or her grade are of a different race."

One Board Member voted against the Plan, stating that "what the Board is doing is a mistake."

The Members of the Board are continuously changing, while the Members of the Administrative Staff remain constant. Certain Members of the Board are elected at biennial election and this puts the terms of the Members on a staggered basis.

Plaintiffs filed seven objections to the Plan on April 18, 1960. It is insisted by the plaintiffs in these objections that: (a) The Plan does not provide for elimination of racial segregation "with all deliberate speed" as required by the Fourteenth Amendment to the Constitution; (b) it does not take into account the five years which have elapsed during which the Board has failed and refused to comply with the Fourteenth Amendment; (c) a period of twelve years for the consummation of the Plan is not in the public interest and is not in compliance with the Fourteenth Amendment; (d) the defendants have not carried the burden of proof of showing problems related to public school administration as specified by the Supreme Court in the second decision of Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; (e) under the Plan, the infant plaintiffs and all other children attending the public schools of Knoxville in their class will be deprived of their right to attend a desegregated school as guaranteed to them by the Fourteenth Amendment; (f) the Plan deprives infant plaintiffs and those similarly situated from enrolling in Fulton Technical High School and other special vocational schools, summer courses and kindred educational training of a specialized nature as to which enrollment is not based upon residence; and (g) Paragraph 6 of the Plan violates the due process clause of the Fourteenth Amendment in that said paragraph provides racial factors as conditions to support requests to transfer, and the racial factors are designed and necessarily operate to perpetuate racial segregation.

A trial was held on August 8–11, 1960 on defendants' motion for the adoption of the Plan and plaintiffs' objections thereto. Substantial testimony was introduced during the trial, a material portion of which consisted of the reading of discovery depositions of various individual defendants and of a number of adult plaintiffs.

The controlling issue in the case and to which the greater part of the evidence was directed is:

Is the time delay provided for in the grade a year desegregation proposal reasonably necessary in the public interest and is it "consistent with good faith compliance at the earliest practicable date"? See Brown v. Board of Education, supra.

It is the position of the Board that a more accelerated plan for desegregation would cause administrative problems of great magnitude and serious interruption in the operation of the Knoxville School System with resultant deleterious effects upon the school children of both races.

The Board maintains that the grade a year plan is a compliance with the "deliberate speed" concept in the light of the existing conditions in the Knoxville area.

As to the good faith phase of the issue, the Board insists that its Members, the then Superintendent of Schools and the Members of his Staff, began to consider the question of desegregation immediately following the first decision in the Brown case in 1954 but that they withheld efforts to perfect a plan until the

second Brown decision on May 31, 1955; that following this decision Board meetings and workshop meetings were held by the Board with principals of Negro schools and white schools; and that much of the literature on the subject of desegregation was studied with the view of finding a plan that would meet the needs of the Knoxville community and at the same time protect and enforce the constitutional rights of the Negro children attending the public schools of Knoxville.

In support of the Plan, *Superintendent Johnston* testified that he became Superintendent on June 15, 1955 and that on the next day he asked his Administrative Staff to come together to discuss the Supreme Court's decision and steps that ought to be taken to study the best approach to compliance with the decision; that out of the meeting grew the suggestion that some Members of the Staff and of the Board visit a city with experience in desegregation; and that the City of Evansville, Indiana was chosen because of its comparable size and because it had been operating under a desegregated program since 1949. He testified that two Members of the Board and two Members of the Staff visited the schools in that City and spent a day or more in the schools and with the superintendent.

Subsequently, on July 25, 1955, he inaugurated a program of inviting white principals, Members of the Board and Staff to discuss how best to comply with the Supreme Court's decision. He attempted at the meeting to establish an atmosphere or environment under which these persons would talk freely on the subject.

A week later, they had a similar meeting with the Negro principals, Members of the Board and Staff at which exactly the same matters were discussed in an atmosphere under which the Negro principals would feel free to ask questions and make suggestions.

He testified that separate meetings were held at his own suggestion with the thought that participants would talk more freely if they met separately and that thereby he could better assess whether there was opposition or a good feeling about the whole business.

At the same time, he inaugurated a series of Staff meetings for a period of an hour a day for 15 successive working days for the exchange of views on the problem.

On January 26, 1956, he testified that they convened a meeting of the Negro principals and general supervisors in the central office to determine whether they were willing to participate in a series of meetings to consider the subject of desegregation. A similar meeting with the white principals came a few days afterwards.

On February 1, 1956, a Staff meeting was held to survey the willingness of principals of both groups to join in a study group or workshop. On February 2, 1956, all principals regardless of race were called for a meeting in the central office at which no shyness or reticence to discuss the subject appeared. He commented that for 32 years to his personal knowledge Negro principals and white principals had met together in regular meetings.

He testified that a series of workshop meetings were developed to explore different plans and that out of these meetings there evolved eight suggestions to be submitted to the Board of Education without recommendation which were the result of the studies of the principals of both races and of the Staff.

Subsequently, in January, 1957 at a meeting, he requested the principals of both races and the supervisors to meet with him to further discuss the subject. At that meeting he indicated that he would like personally to come to the schools and sit down with their faculties and talk with the teachers to see how they felt on the subject because he felt that "the burden of making that plan successful * * * would be on the shoulders of the teachers who work closely with children and with parents." Following this meeting, he testified that he started going to schools at the invita-

tion of the principals and that he attended 12 to 15 such faculty meetings. It was his purpose to discover through these informal meetings whether there were members of the faculties who opposed any form of desegregation. He wanted to determine whether there were pockets of resistance or whether a favorable climate for compliance existed among the teachers. These meetings continued through the school year 1957. By fall, he testified, the invitations seemed to slow down and that he seemed to detect a feeling amongst the Negro and white principals which did not exist before. He pointed out that there had been dynamiting and other difficulties around the Knoxville area; and that trouble had arisen in Nashville and Clinton.

Superintendent Johnston stated that violence occasioned by desegregation in neighboring cities caused us to reflect a little more on how it will affect us and made us more conscious of what might happen here. He pointed out that no child could get an education operating under a feeling of fear or tension or emotional unrest and that every day a child loses from its normal educational program is practically gone forever and will never be completely regained; that order is the first law in the classroom and that an educational program must have order if children were going to learn. He said: "We were concerned with that."

At the same time, he noted that the School Board was engaged in an extensive building program which involved both Staff and Board and which was heavily time consuming; that Board and Staff Members examined blueprints and drawings of the architects minutely and that they made innumerable visits to the buildings when they were under construction and that before a building was accepted it was the duty of the Board to go through it, inspect the rooms, corridors and facilities in the company of the architect and of the representative of the contractor.

This was a massive building program carried out under Bond Referendums of 1946 and 1954 and involved nearly eight million dollars of new construction and remodeling in both white and colored schools.

In implementation of the Plan filed on April 8, 1960, the Superintendent testified that he instructed his Staff to begin work on a zoning map which was approved at a meeting of the Board on August 6, 1960, just two days before the hearings began. He testified that he instructed his Staff that in the preparation of the map there would be no maneuvering or gerrymandering, that the re-zoning and re-establishing of school zones must be based on enrollment studies and on the size and capacity of the buildings. The work was in charge of Mr. Frank Marable, Supervisor of Child Personnel, whose duty it is to check on attendance, school zones and the movement of people.

On cross-examination, he testified that in preparing the map, efforts were made through the pre-school round-up program and estimates of principals to get estimates of the number of children that would be affected. This zoning plan was confined to the elementary schools and did not include the secondary schools.

Under detailed cross-examination, Mr. Johnston pointed out that small groups or pockets of Negro homes were scattered throughout the Knoxville City School System in contrast to major concentrations of Negro citizens; that the zone boundaries were often dictated by artificial barriers like heavily traveled streets and also by the size and capacities of school buildings.

In response to a question that some capacity was preserved at Park Lowry for transfers which are authorized under the Plan, he testified that he had no way of knowing who was going to ask for a transfer and that he only knew that under the Plan white students and Negro students would be treated alike.

He testified categorically that no member of his Staff in working on the map had ever operated deliberately to cut out Negro children; and that they tried to work the thing out on a fair basis, depending on the size of the building, shifting population and enrollment.

With reference to the fact that eight plans were originally developed for submission to the Board and that the Plan which was finally adopted involved only a grade a year desegregation, he testified that the Plan adopted was based on the experience around us and studies of the general situation of desegregation; that it was felt that this plan could be introduced in the City of Knoxville with the least disturbance to the over-all educational program; and that it would be accepted by the majority of citizens with less tension and less emotional excitement than any other plans that had been studied.

He reiterated that the Knoxville School System had been in existence since 1870 and that desegregation would not be easy; that it was the goal to achieve desegregation and at the same time maintain an orderly decorum or environment under which all children could continue to go to school day by day free from tension and free from fear. He repeated that order is the first rule of a classroom.

In presenting the grade a year plan to the Board, the Staff made seven observations in favor of the plan. The first was that it appeared to meet the requirements of the Supreme Court decision and of the laws of the State which placed the burden or responsibility on local boards for desegregation and for the assignment and placement of students. Second, the Plan did not limit the speed with which it could be implemented. Third, it provided for gradual implementation until the complex problems of zoning, transfer and assignments of students could be adjusted in the light of experience. Fourth, it had the advantage of numerous other plans as a background for its adoption. Fifth, the main features of the Plan have been upheld by higher courts. Sixth, the Plan lessened the opportunity for developing prejudices. Seventh, it minimized the possibility of administrative problems that could be of such complexity and magnitude as to seriously undermine and impair the total educational program of the City.

Finally, he emphasized the adaptability of small children and that they do not have the prejudices of older children or grown people and could be fitted into the work easier than older children. He felt that the gradual plan would enable the school system to continue a fine educational program with less tension, less fear and less emotional disturbances than a plan which rushed into a broader field of desegregation. He felt that the gradual plan would have the sympathetic understanding of the great majority of the citizens of the City. He pointed out the importance of this in going before the City Council on behalf of school budgets with which to operate the schools; that the School System had to have the sentiment of the people with it because it involves budgets, their attitude towards referendums for new schools and new buildings, etc.

With reference to evidence that there had already been desegregation of ball parks, public libraries, buses and airport restaurants, etc. in and around Knoxville and that this would seem to indicate that a speedier plan of desegregation could be inaugurated, Superintendent Johnston pointed out that under the compulsory attendance law, children are compelled to go to school for a period of seven hours a day and that he knew of no law that compelled them or any adult to go to a ball park, the library or airport restaurants. He pointed out that those were optional matters, but that under the school law children were required to go to school.

In the course of his testimony, Superintendent Johnston testified to certain achievement tests given all children in the sixth grade in the Knoxville schools. His testimony was that as a result of these tests it appeared that the achievement levels of students from white schools were somewhat above the national norm and that the student level from colored schools were substantially below the national norm. This testimony was objected to by the plaintiffs on the ground that the results of the tests were

hearsay. The Court recognized this objection, but admitted the testimony for such bearing as it might have on the good faith of the Board in utilizing the grade a year plan.

In his deposition, Superintendent Johnston was asked about the industrial courses given at Austin High School, the colored school, and at Fulton High School, the white technical school. It appeared from his testimony that Fulton High gives a course in television, a course in advanced electronics, ones in air conditioning, refrigeration, commercial art, commercial photography, distributive education, drafting, machine shop, printing and sheet metal which are not offered at Austin High School. Certain courses, he testified, such as brick masonry, tailoring, etc., are offered at Austin which are not offered at Fulton.

Colored students are not admitted to these courses at the present time at Fulton High School because of the segregated schools.

Generally, the testimony of Superintendent Johnston was that the school facilities and teaching level at both the colored and white schools are equal. He pointed out that the colored teachers are paid at the same salary level as those in the white schools and that the work done is equivalent. These facts were also stipulated.

The conclusion the Court draws from this evidence is that students including plaintiffs now in school who would not, if Plan Nine were adopted, be permitted to go to an integrated school, would still have equal opportunities for an education in the fine colored schools with their excellent teaching staffs.

This conclusion is not true of the special technical courses offered at the Fulton High School. Under Plan Nine colored students now in school and desiring those courses would be barred from taking those courses. They would have to complete their scholastic education without the opportunity of taking these courses. Superintendent Johnston testified that he had talked to the teachers in the

Fulton High School and they were of the opinion that to admit colored students to these courses would cause trouble and diciplinary problems, an opinion in which he joined.

Nevertheless, the Court feels that despite the great merit of Plan Nine, it is deficient in that it precludes colored students now in school from ever participating in these specialized courses.

*Dr. Burkhart*, Chairman of the Board since 1958, was of the opinion that complete desegregation would disrupt the orderly process of education in Knoxville and that the children of both races would be materially affected thereby. This opinion was based in part on the attitude of the great majority of the citizens of the Knoxville area who feel that the citizenship is not prepared at this time to accept anything except gradual desegregation. He was further of the opinion that complete desegregation would cause violence in the community.

This Court recognizes that the Supreme Court stated in substance in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, that opposition to desegregation was not alone a sufficient reason to postpone desegregation. But, the Court also stated in substance in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 that one of the factors that the trial court should consider in resolving the question of immediate and complete desegregation or gradual and complete desegregation is the interest of the people who are affected in the community.

Dr. Burkhart was of the opinion that gradual desegregation would be best for the students and for the community. He felt that an abrupt change would affect the teachers and the students of both races and would create serious administrative problems.

*Dr. Moffett*, another Member of the Board, felt that Plan Nine was the best plan for the Knoxville schools and gave three principal reasons to support his belief, which are in substance as follows:

(a) First grade eliminates any educational advantages or disadvantages.

(b) The present Plan is more receptive to constituents.

(c) The present Plan is better for teachers and other personnel of the schools.

*Andrew Johnson*, a well-known lawyer of Knoxville, served as a Member of the Board from January 1, 1954 through December 31, 1957. He explained in detail the careful study made by Members of the Board and school personnel during the period that he was a Board Member.

A building program involving some eight million dollars was inaugurated and extensively carried on while he served as a Member of the Board. This program consumed considerable time of Board Members.

A series of meetings were held by Board Members with the Superintendent and his Staff during the year 1955 when desegregation matters were discussed. The initial attitude of the Board was to comply with the law with respect to desegregation as declared by the Supreme Court in the Brown case. In 1954, the Members of the Board felt that desegregation could be effectuated without too many problems because the citizenship at that time appeared to be passive. Later, the Board Members began to hear rumbling of the disturbances from citizens and when actual violence began in Clinton, it caused the Board to go slow. This violence gave rise to a consciousness of the Members of the Board of the dangers of making an unwise step. The Board was delayed by circumstances over which it had no control.

The opinion of the public influenced the actions of the Board. The Board was looking at local conditions. Threats of violence were made if desegregation were inaugurated. On June 10, 1957 some fifteen citizens appeared before the Court and some of them suggested that the Board Members resign rather than institute desegregation. There was real danger. .

One John Kasper appeared before the Board that night. Mr. Johnson received a number of telephone threats. The Members of the Board were afraid of physical violence against the colored children. At that time, the colored principals of the schools felt that desegregation should be given thorough consideration, but that it should not start immediately.

The dynamiting and other violence in Clinton and Nashville were other causes for the Board moving towards desegregation more slowly.

*Mr. Marable* is Supervisor of Child Personnel. He handles transfers. He stated that the schools were overcrowded in some sections. Transfers were comparatively easy under the old plan although they are considered carefully. If the reasons are good, a transfer is made. It is an administrative matter. Primarily, a child is expected to go to school in the zone of his residence.

Plaintiffs, Mrs. Barber, and Messrs. Robinson, Sr., Ward, Graves, Winton, Sr. and Goss, testified to having made applications for admittance of their minor children to white schools, all as shown in the complaint and the stipulation, and that they were denied admittance solely because of their race or color. Each of these plaintiffs gave a reason why he wanted his infant child to attend a white school, one of the reasons being that he or she lived near the white school.

This Court is of the opinion and finds that the foregoing evidence shows beyond question good faith on the part of the Board in making an honest effort to find the solution of a very troublesome problem, namely, a plan of desegregation that would best fit the needs of the Knoxville area and at the same time implement the decision of the Supreme Court in the Brown case. The teaching of that case, as well as that of the cases of Cooper v. Aaron, supra, and Kelley v. Board of Education, 6 Cir., 270 F.2d 209, is that the problem of desegregation must be solved in accordance with the exigencies of the case and that the interest of the school children of both

races, the interest of the school personnel and of the community involved are the prime factors in resolving the issue; that local school problems differ and what would be a reasonable time to integrate in one community might be unreasonable in another community; that the question of speed is to be decided with respect to existing local conditions; that the operation of the public schools is the business of the local School Board and that the courts should not interfere with such operation unless it is necessary for the enforcement of constitutional rights; and that the Court should not substitute its judgment for that of the local School Board in the promulgation of plans of desegregation and that if the Board has acted in good faith its action should not be set aside so long as such action is consistent with the eventual establishment of a non-discriminatory school system at the earliest possible date consistent with the interest of the school children, school personnel and the community.

The Court finds that the Plan submitted by the Board is not only supported by the preponderance of the evidence, but by all of the evidence, with one exception. With reference to the technical courses offered in the Fulton High School to which colored students have no access, it directs that the defendants in this cause restudy the problem there presented and present a plan within a reasonable time which will give the colored students who desire these technical courses an opportunity to take them.

This Court is concerned—gravely concerned—with the incidents of unrest and violence which have attended the desegration of schools in nearby communities. They have not only been made matters of evidence in this case, but some are matters with which this Court has had to deal, and of which it takes judicial notice. These incidents have been characterized by the bombing of homes and of school buildings and by acts of individual terrorism which have destroyed the orderly atmosphere in which good schooling can thrive. They have

revealed pockets of hate and lawlessness which are overshadowing imponderables in this case.

Glowing pictures of what may be, or ought to be, characterize the partisanship of those not called upon to make decisions. It is easy to ignore, and many of these partisans have ignored, considerations which weigh so heavily upon the Court. Some who might have taken responsibility have, despite the admonitions of the Supreme Court in the Brown and other cases, chosen not to assume it.

As the case has developed, the ultimate responsibility for decision rests with the Court. It alone must deal with the realities—realities with which it has had acrid experience.

If it decides wrongly, the transition toward the goal of a harmonious and unified school system—a goal to which all parties to this case subscribe—will receive an untold setback. If it decides rightly, there may well be smooth and steady progress toward full integration. Some individuals, parties to this case, will not themselves benefit from the transition. At a turning point in history some, by the accidents of fate, move on to the new order. Others, by the same fate, may not. If the transition is made successfully, these plaintiffs will have had a part. Moses saw the land of Judah from Mount Pisgah, though he himself was never to set foot there.

Perhaps the transition could be faster. Who can know? When a bridge is built or modified, engineers add a factor of safety far beyond the expected load. The analogy breaks down. In altering a school system, no one knows the load; there is no known factor of safety. Traditions, ways of thinking, aspirations, human emotions—all are involved. Emotions are sometimes stable, sometimes explosive. This Court has had experience with both. It rather anticipates that the emotions of the people of Knoxville are under control. It does not know. It would have had the same expectation of another community. It was wrong.

All things considered, Plan Nine seems to offer more safety and more assurance

for an orderly progression toward a fully unified school system. Under the evidence, there is less danger of disorder—more hope of steady progress. When the risks of which this Court is cognizant are taken into account, Plan Nine seems to meet the tests laid down by the Supreme Court. The Plan, with the reservation noted, is approved.

Present order in accordance with views herein stated.