369 F.2d 29
 James E. SWANN and Edith Swann, minors, by their parents and
next friends, Rev. and Mrs. Darius L. Swann, et
al., Appellants,
v.
The CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, a public body
corporate, Appellee.
 No. 10207.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 1, 1965.
Decided Oct. 24, 1966.
 
 J. LeVonne Chambers, Charlotte, N.C. (Conrad O. Pearson, Durham, N.C., Jack Greenberg and Derrick A. Bell, Jr., New York City, on brief), for appellants.
 Brock Barkley, Charlotte, N.C., for appellee.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en Banc.
 HAYNSWORTH, Chief Judge:
 
 
 1
 In this school case, the plaintiffs have appealed from the denial of certain affirmative relief which they sought in the District Court. We think the District Court's disposition of the matter was correct.
 
 
 2
 Prior to 1962, the School Board had purported to proceed under North Carolina's Pupil Placement Act. Except to the extent that assignments were affirmatively made under that Act, school assignments were controlled by a system of dual attendance zones, a method of assignment which is clearly unconstitutional. In 1962, however, the School Board affirmatively resolved to do something about it.
 
 
 3
 Coincident to the adoption of a school construction program, involving the expenditure of $30,000,000 over a five-year period, to replace old and inadequate buildings and to care for areas of rapidly expanding school population, the School Board adopted a plan of single school zoning. The rezoning was to be accomplished over a period of years, however, and coordinated with the construction program so as to avoid, wherever possible, multiple pupil transfers and general rearrangement of the attendance zones.
 
 
 4
 For the school year 1962-1963, such attendance zones were established for two schools only. For the next year, 1963-1964, twelve more schools were zoned, making a total of fourteen. In 1964-1965, the total of the zoned schools rose to forty-three, and in the school year 1965-1966 ninety-nine of the one hundred and nine schools in the system had been zoned.
 
 
 5
 In 1962, the Board permitted any member of a racial minority in a particular school to transfer to a school in which his race was in the majority.[1] Later, this right of transfer was made available to all pupils, so that, as applied, every pupil in the schools, whatever the basis of his initial assignment, has an unqualified right of transfer to any other school in the system, subject only to space limitations in the school to which transfer is sought. In practice, each pupil is given three choices, and the space limitation has not proved an obstacle in the effective exercise of the right.
 
 
 6
 Under the geographic zoning of the ninety-nine schools during the school year 1965-1966, 1,955 Negro pupils were initially assigned to schools in which white pupils were predominant. Ninety-one of those exercised their transfer rights and were retransferred to schools of their choice which were largely attended by Negroes. Two hundred and sixty-two Negro pupils exercised their right to transfer from schools attended entirely or predominantly by Negroes to schools populated principally by whites. Thus, in the school year 1964-1965, 2,126 Negroes actually attended schools in which white pupils constituted the majority, or a substantial proportion of the school's population.
 
 
 7
 Three hundred and ninety-six white children were initially assigned under the geographic zoning plan to schools in which Negro pupils constituted a majority of the population. Most, but not quite all, of those three hundred and ninety-six white children, exercised their transfer rights and were reassigned to schools in which white students predominated.
 
 
 8
 The number of white schools integrated and the number of Negroes attending those schools has steadily increased, the largest increase occurring in 1964-1965. It is expected that there will be still larger increases in the coming year, particularly as a result of the elimination of the ten unzoned schools.
 
 
 9
 The ten unzoned schools are entirely Negro. They are rural schools, and their pupil populations are drawn from wide areas which overlap the established zones of other schools. This, of course, is not an acceptable basis for the initial assignment of pupils.[2] This, the Board recognized, however, but it asked approval of its procedures upon the ground that those ten, physically inferior, schools were going to be eliminated. The Board felt that it was impractical to establish geographic zones for them and felt it unwise to reassign students in those schools to other schools when, under the progressing construction program, those same pupils would necessarily be reassigned to still other schools after only a year or two. Meanwhile, it thought that the fact that each student attending those ten schools had an unrestricted right to transfer to any school of his choice was a sufficient corrective to authorize approval of the Board's operation for the short interim period. It represented to the District Court that it expected to have established geographic zones for the assignment of pupils to all schools in the system by the school year 1966-1967, and, in all events, no later than 1967-1968.[3]
 
 
 10
 Under these circumstances, we think the District Court's approval of the Board's procedures for the year 1964-1965 was within the bounds of its discretion. The Board appears to have been busily engaged in the elimination of vestiges of the discriminatory system of assignments which had prevailed earlier. There was a rational basis for not undertaking geographic rezoning of those ten antiquated schools, and, in light of the unfettered right of transfer available to each of the pupils in those ten schools, delay of the one year in their involuntary transfer to other schools was not unwarranted, when the delay would avoid successive transfers for a substantial portion of them.
 
 
 11
 This appeal did not reach us until the 1965-1966 school year was well underway when transfers for that year would have been most undersirable. Now that the operation of the ten schools without grographic zoning has been eliminated for the school year 1966-1967, the plaintiffs' complaint about the operation of the ten unzoned schools last year has become largely academic.
 
 
 12
 The plaintiffs complain about some of the boundaries between established school zones. The District Judge found none of these complaints justified. In a number of instances, possible changes in the boundaries, as suggested by the plaintiffs, would not have affected the make-up of the school population, but would have operated only to transfer white pupils from one school predominantly attended by whites to another school predominantly attended by whites. In the remaining instances, the lines drawn by the School Board were found to follow natural boundaries and to be entirely reasonable. In one instance of which the plaintiffs particularly complain, the line runs along the survey route of a major Belt highway to be constructed, running through an uninhabited area crossed by no other streets or roads. If the line were moved to McAlway Road, it would bring into the Billingsville School attendance zone a residential area from which there is no direct access to the Billingsville School, though pupils in that area live in very close proximity to Costswold School, in which zone they now are. Clearly, the School Board's boundary is the more reasonable.
 
 
 13
 On this phase of the case, the principal complaint of the plaintiffs appears to be that the zoning of the schools has not produced a greater mixture of the races than it has. There are still some all white schools; there are still some all Negro schools, and, though the number of those have been declining, there is no reason to think that some of them will not remain in the school year 1966-1967. The plaintiffs contend the lines should have been drawn with the conscious purpose of eliminating as many of such schools as possible and of achieving a maximum intermixture of the races.
 
 
 14
 Whatever the Board may do in response to its own initiative or that of the community, we have held that there is no constitutional requirement that it act with the conscious purpose of achieving the maximum mixture of races in the school population.[4] The Constitution permits the Board to consider natural geographic boundaries, accessibility of particular schools and many other factors which are unrelated to race. So long as the boundaries are not drawn for the purpose of maintaining racial segregation, the School Board is under no constitutional requirement that it effectively and completely counteract all of the effects of segregated housing patterns.
 
 
 15
 The School Board does provide some permissive amelioration of the effects of segregated housing patters through its granting of free transfer rights. No grographic boundaries could be drawn which would result in the geographic assignment of Negro pupils living in the Western and Northwestern portions of Charlotte to integrated schools, but each of those pupils does have an absolute right to attend an integrated school if he wishes under the free choice option.
 
 
 16
 Nevertheless, the plaintiffs also complain that white pupils assigned to predominantly Negro scheols have a transfer option, which has been exercised by most of them. A substantial number of Negroes in the same minority situation have exercised their options, too, and, as pointed out above, a system of free transfers in the only means by which many Negroes can attend integrated schools. Since each pupil in the system has the option, we think the existence of the right of transfer is constitutionally permissible.[5]
 
 
 17
 As part of its plan, the School Board had adopted a resolution looking toward the 'ultimate' integration of the faculty and staff. The District Court required an amendment of that resolution to make it immediately effective. No one has complained of its action requiring that amendment, but it is appropriate to mention it here, since it tends to complete the picture of the Board's ultimate purposes and to show the care with which the District Court considered the Board's operations and plans in light of the plaintiffs' complaints.
 
 
 18
 If, in light of any development or circumstance occurring since the hearing of this case, any party shall have any reason to apply to the District Court for further relief or for any modification of its order, leave is granted for such application whether or not a certified copy of the judgment of this Court in lieu of its mandate has been lodged in the District Court.
 
 
 19
 Affirmed.
 
 
 20
 SOBELOFF and J. SPENCER BELL, Circuit Judges (concurring):
 
 
 21
 We concur in the result in this case, but for the reasons set forth in our dissents in Bradley v. School Bd. of City of Richmond, 345 F.2d 310 (1965), and Gilliam v. School Bd. of City of Hopewell, 345 F.2d 325 (1965), we cannot associate ourselves with the language of that portion of the opinion which discusses generally the School Board's duty to desegregate. In Bradley we said:
 
 
 22
 'A plan of desegregation is more than a matter of words. The attitude and purpose of public officials, school administrators and faculties are an integral part of any plan and determine its effectiveness more than the words employed. If these public agents translate their duty into affirmative and sympathetic action the plan will work; if their spirit is obstructive, or at best negative, little progress will be made, no matter what form of words may be used.
 
 
 23
 'Affirmative action means more than telling those who have long been deprived of freedom of educational opportunity, 'You now have a choice.' In many instances the choice will not be meaningful unless the administrators are willing to bestow extra effort and expense to bring the deprived pupils up to the level where they can avail themselves of the choice in fact as well as in theory. A court, before approving a plan, must scruitinize it in detail to satisfy itself that the assumptions upon which the plan is predicated are actually present. The district judge must determine whether the means exist for the exercise of a choice that is truly free and not merely pro forma. This may involve considering, for example, the availability of transportation, the opportunity to participate on equal terms in the life of the school after the pupil's arrival, and any other circumstances that may be pertinent.
 
 
 24
 'All recognize that the problems of education are not simple and are intertwined with problems in other areas of public and private activity. But while a complete solution does not lie in the hands of the present defendants, there is much they can do in their own sphere of responsibility to disestablish the heritage arising from imposed racial discriminations of the past.
 
 
 25
 'It is now 1965 and high time for the court to insist that good faith compliance requires administrators of schools to proceed actively with their nontransferable duty to undo the segregation which both by action and inaction has been persistently perpetuated. However phrased, this thought must permeate judicial action in relation to the subject matter.
 
 
 26
 'This is far from suggesting that children are to be uprooted arbitrarily and bussed against their will to distant places merely to place them with children of the other race. No such thing has been proposed or contemplated in Richmond or, so far as we know, anywhere in this circuit. The true alternative, however, surely is not abdication of Board responsibility and the leaving of accomplishment of a nonracial educational system to the unaided efforts of individuals who, even if not deliberately obstructed, lack the knowledge and mastery of the school system possessed by the Board. The authorities, not these individuals, have the duty and power to provide adequate leadership in reaching, with a minimum of personal frictions, alarms and frustrations, the constitutionally protected goal of equal educational opportunity for all children. See Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1964).' 345 F.2d at 323-324.
 
 In Gilliam we said:
 
 27
 'The neighborhood school concept is a legitimate one, and insofar as zone boundaries are drawn without racial discrimination along natural geographical lines we agree that they may be accepted as valid. We are conscious, however, that the size and location of a school building may determine the character of the neighborhood it serves. In applying the neighborhood school concept, the School Board, therefore, must keep in mind its paramount duty to afford equal educational opportunity to all children without discrimination; otherwise school building plans may be employed to perpetuate and promote segregation.' 345 F.2d at 329.
 
 
 28
 We adhere to these views and submit that they present a correct philosophy and the true measure of the School Board's duty.
 
 
 
 [1]
 Such a scheme of minority transfers was later held to be discriminatory and unconstitutional. Goss v. Board of Education of City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632
 
 
 [2]
 Nesbit v. Statesville City Bd. of Educ., 4 Cir., 345 F.2d 333; Wheeler v. Durham City Bd. of Educ., 4 Cir., 309 F.2d 630, and 346 F.2d 768
 
 
 [3]
 The Charlotte Observer of April 22, 1966 (page B1) reported the adoption by the Board of resolutions fully complying with its representations to the court and providing for the completion of geographic zoning for each school in the system for the school year 1966-1967
 
 
 [4]
 Wheeler v. Durham City Bd. of Educ., 4 Cir., 346 F.2d 768; Bradley v. School Board of City of Richmond, 4 Cir., 345 F.2d 310, 316; Jeffers v. Whitley, 4 Cir., 309 F.2d 621; Evers v. Jackson Municipal Separate School District, 5 Cir., 328 F.2d 408; Cohen v. Public Housing Administration, 5 Cir., 257 F.2d 73; Avery v. Wichita Falls Ind. School Dist., 5 Cir., 241 F.2d 230; Rippy v. Borders, 5 Cir., 250 F.2d 690; Bell v. School City of Gary, Indiana, 7 Cir., 324 F.2d 209. See also Singleton v. Jackson Municipal Separate School District, 5 Cir., 348 F.2d 729
 
 
 [5]
 Bradley v. School Board of City of Richmond, 4 Cir., 345 F.2d 310; Jeffers v. Whitley, 4 Cir., 309 F.2d 621; Dillard v. School Board of City of Charlottesville, 4 Cir., 308 F.2d 920, 923-924; see also Goss v. Board of Educ. of City of Knoxville, 373 U.S. 683, 687, 83 S.Ct. 1045