**Josephine GOSS et al., Plaintiffs-Appellants,**

**v.**

**The BOARD OF EDUCATION OF the CITY OF KNOXVILLE, TENNESSEE, et al., Defendants-Appellees.**

**No. 20834.**

United States Court of Appeals, Sixth Circuit.

June 22, 1971.

Motion Denied June 30, 1971.

See 91 S.Ct. 2293.

Norman J. Chachkin, New York City, for plaintiffs-appellants; Carl A. Cowan, Knoxville, Tenn., Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, James M. Nabrit, III, Sylvia Drew, New York City, on brief.

Sam F. Fowler, Jr., Knoxville, Tenn., for defendants-appellees.

Before WEICK and MILLER, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

This case has to do with desegregation of the public schools of Knoxville, Tennessee. The United States District Court in Knoxville, the United States Court of Appeals for the Sixth Circuit and, to a lesser degree, the Supreme Court of the United States have, since 1957, been attempting to come up with a plan for the Knoxville schools that will be obedient to the decision of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Such endeavor has produced the following opinions and decisions: Goss v. Board of Education, 186 F.Supp. 559 (E.D.Tenn. 1960); Goss v. Board of Education, 301 F.2d 164 (6th Cir. 1962); Goss v. Board of Education, 373 U.S. 683, 688, 689, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Goss v. Board of Education, 305 F.2d 523 (6th Cir. 1962); Goss v. Board of Education, 270 F.Supp. 903 (E.D.Tenn. 1967); Goss v. Board of Education, 406 F.2d 1183 (6th Cir. 1969); Goss v. Board of Education, 320 F.Supp. 549 (E.D. Tenn.1970).

No effort was made to obtain Supreme Court review of the last of our above decisions. Without such effort, and on November 17, 1969, plaintiffs filed a pleading entitled Motion for Immediate Relief, which asked that "defendant be required to convert to a unitary school system *at once and without any further delay.*" This notwithstanding that our last unappealed decision had held that Knoxville had already converted its schools into a "unitary school system." The District Court, however, entertained the motion. Extensive proofs were taken and another plenary opinion entered by District Judge Robert Taylor on July 1, 1970—Goss v. Board of Education, 320 F.Supp. 549 (E.D.Tenn.1970). It is this decision which is the subject of the appeal now before us.

Except for some commands as to improvement in faculty desegregation, some revision of the boundaries of some zones, some improvement in the school record keeping, and correction in enforcement of its transfer policy, Judge Taylor's

opinion and order denied the relief sought by plaintiffs' Motion for Immediate Relief. During the reception of proofs, an interim order was entered on April 3, 1970, limiting consideration to matters that had arisen since June 7, 1967. That was the date of the District Court order which had been affirmed by this Court in its unappealed decision, announced February 10, 1969. It was the District Judge's view that his decision of June 7, 1967, Goss v. Board of Education, 270 F.Supp. 903, so approved by us on February 10, 1969, Goss v. Board of Education, 406 F.2d 1183, was res judicata, or at least the law of the case, as to all matters adjudicated by the 1967 decision.

In Goss v. Board of Education, 270 F.Supp. 903 (E.D.Tenn.1967), District Judge Taylor had held as follows:

"Since the Knoxville School System is desegregated under the plan which has been in operation since the school year 1963–64 and since the preponderance of the evidence shows that the plan is not being operated to deprive Negro students of their constitutional rights and that Negro school teachers are not being discriminated against because of their race, it is, therefore ORDERED that the various objections to the plan be, and same hereby are, denied * * *." 270 F.Supp. at 918.

In our affirmance of Judge Taylor— Goss v. Board of Education, 406 F.2d 1183 (1969)—we said:

"We are not sure that we clearly understand the precise intendment of the phrase 'a unitary system in which racial discrimination would be eliminated,' but express our belief that Knoxville has a unitary system designed to eliminate racial discrimination." 406 F.2d at 1191.

Traditional precedents do indeed suggest that those decisions should be considered as having established the law of the case, and that the conduct of Knoxville up to June 7, 1967, as its effort to comply with Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) should not now be judicially revisited. In Judge Taylor's 1967 decision he said:

"This case having been in this Court since 1959 and the Court being of the opinion as outlined above that the Board and school authorities are moving skillfully and with expedition toward the full integration of the Knoxville School System, that there is no further need for the schools to operate under Court supervision, it is further ordered that the case be stricken from the docket." 270 F.Supp. at 918.

However, in requiring that the case be kept open on Judge Taylor's docket, we said:

"In the time ahead, and consistent with its need and duty to serve without discrimination its entire school population, the Knoxville Board of Education may wish to consider some pairing of existing schools and some alterations of its plans for future construction. We make no commands in this regard." 406 F.2d at 1191.

We believe, however, that Knoxville must now conform the direction of its schools to whatever new action is enjoined upon it by the relevant 1971 decisions of the United States Supreme Court.

We turn, then, to the cases of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, and its companions, all announced on April 20, 1971. Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586; McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582; and Moore v. Charlotte-Mecklenburg Board of Education, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590. Since announcement of these decisions, and relying on them, appellants have filed in this and other appeals before us, what they have denominated Motion of Plaintiff-Appellants to Expedite Determination of Appeals. By

this motion, they ask that we command the District Court to order the Knoxville School Board to forthwith proceed as follows:

1) Direct defendants to file a plan *within two weeks* for the 1971–72 school year that completely dismantles the remaining vestiges of segregation within the system;

2) Direct, without fixing any specific ratios, that such plan, with respect to student assignments, move toward the establishment of a racial balance *substantially the same in each school of the system,* and in this endeavor to employ any desegregation technique necessary, *including busing;*

3) Direct that such plan, with respect to faculty desegregation, establish in *each school* a racial balance of principals, teachers, teacher-aids and other staff working directly with children which substantially reflects the racial composition of each such class of faculty within the entire system; this to be accomplished not later than the commencement of the 1971–72 school year;

4) Allow plaintiffs time to object to any plan proposed by defendants and to file an alternative plan;

5) Directing that the District Judge appoint an educational expert to assist him in arriving at a plan that will meet constitutional standards;

6) Authorize plaintiffs to retain an educational expert to assist them in preparing a plan to be submitted to the District Court, *the cost of such employment and use of such expert to be borne by the defendant school district;*

7) Direct defendants to co-operate with both experts by providing office space at the headquarters of the Superintendent of Schools with full access to all information, plans or studies concerning the system the experts deem necessary, by paying all fees and expenses of the experts, and by providing stenographic assistance, use of office machines, computers, draftsmen, telephone service, and such other profession-al and technical assistance as may be required;

8) ·Schedule a prompt hearing on the sufficiency of the submitted plans and take such necessary action as to *assure implementation of a unitary system by the commencement of the 1971–72 school year;*

9) Enjoin any new construction, expansion or abandonment of school facilities until completion of the hearing and thereafter require submission of any such plans to the District Court with notice to the plaintiffs;

10) Direct defendants to file various semi-annual reports with the District Court concerning the racial composition of the school faculties, and if in any year the overall ratio of black to white educators in the various schools does not approximate the ratio of black to white educators in the system, the district shall actively recruit black educators in filling any vacancies; information concerning busing; a description of plans for future school construction, expansion or abandonment, and a map of attendance zones, if such is the method of student assignment approved;

11) Allow plaintiffs their costs, including attorney fees.

Expanding and supplementing the foregoing which we have attempted to reduce in size, is an Appendix A, which sets out in greater detail what the school board must do to accomplish faculty desegregation. Also attached is an Appendix B, entitled "Report" which would have the District Court require semi-annual reports to be filed by the school authorities, giving extensive and detailed reports of the progress of their obedience to the directions of Appendix A.

 We are not advised from what material plaintiffs constructed the elaborate rules and directions set out. It is apparent, however, that they are, in substance, the commands of District Judge James B. McMillan, set out in his opinions in Swann v. Charlotte-Mecklenburg Board of Education, 306 F.Supp. 1299

(W.D.N.C.1969) 311 F.Supp. 265 (1970), with some extensions and elaborations. The opinions of Judge McMillan, 306 F. Supp. 1299, 311 F.Supp. 265, and 318 F. Supp. 786, affirmed by the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), express with some asperity his pique that the school authorities had failed to fully adopt a plan constructed by an expert, Dr. John Finger, who had been appointed by the District Judge. The District Court opinions reflect in observable measure Judge McMillan's doubts as to the genuineness of the school authorities' concern for the constitutional rights of both the black and white school children of Charlotte and Mecklenburg Counties. The broadness of their commands bespeak some motivation of reprisal. In the long history of the litigation we deal with, we find no such bitter contesting between the school authorities of Knoxville and the court, nor between the plaintiffs and the school authorities. We, therefore, initially observe that while the Supreme Court found legally tolerable what may be referred to as the *Mecklenburg* rule, it by no means directed that its commands be obeyed everywhere. We, therefore, conclude that there is nothing in *Swann* (1971) that requires us to announce a fiat imposing on Knoxville the identical pattern fashioned by Judge McMillan for his case.

Respectfully, we read Swann v. Charlotte-Mecklenburg Bd. of Ed. (1971), as primarily a command to all school authorities in states where *de jure* segregation was once the rule, to do a better job of mixing the races and teaching staffs than they have heretofore done. We set out, however, what we think are its clear commands as well as its views as to what is desirable and permissible.

**I**

■ The neighborhood style of desegregation no longer can be viewed as per se constitutional. This is so notwithstanding that such was the substantial

holding of the Fourth Circuit in its 1966 decision of Swann v. Charlotte-Mecklenburg Bd. of Ed., 369 F.2d 29 (4th Cir.). It there affirmed a District Court decision—Swann v. Charlotte-Mecklenburg Bd. of Ed., 243 F.Supp. 667 (1965)—which had said:

> "Thus far it has not been held *unconstitutional* to assign children to a school on the basis of their residences in a cohesive and contiguous geographical area." 243 F.Supp. at 670 (Emphasis supplied.)

And then went on to say:

> "Whatever the Board may do in response to its own initiative or that of the community, we have held that there is no constitutional requirement that it act with the conscious purpose of achieving the maximum mixture of races in the school population." 369 F.2d at 32.

The concurring opinion of Judges Sobeloff and Bell quoted from their opinion in Gilliam v. School Bd. of City of Hopewell, 345 F.2d 325, 329 (1965):

> " 'The neighborhood school concept is a legitimate one, and insofar as zone boundaries are drawn without racial discrimination along natural geographical lines we agree that they may be accepted as valid.' " 369 F.2d at 34.

Such concurring opinion went on to recite their previous views that,

> "This is far from suggesting that children are to be uprooted arbitrarily and bussed against their will to distant places merely to place them with children of the other race. No such thing has been proposed or contemplated in Richmond or, so far as we know, anywhere in this circuit." 369 F.2d 34.

In this court's *first* consideration of this case—now before us for the fourth time—we held valid Knoxville's use of the neighborhood plan as a method of obeying *Brown*. Goss v. Bd. of Ed., 301 F.2d 164, 166 (6th Cir. 1962). The Supreme Court had that decision before it on certiorari but limited its criticism to a freedom of choice plan. Goss v. Bd.

of Ed., 373 U.S. 683, 83 S.Ct. 1045, 10 L.Ed.2d 632 (1963). In Goss v. Bd. of Ed., 305 F.2d 523 (6th Cir. 1962), we looked again at Knoxville's plan. The neighborhood plan of integration was not questioned there by the plaintiff. Certiorari was not sought. In 1969 we again considered the neighborhood system plan of integration. Goss v. Bd. of Ed., 406 F.2d 1183 (6th Cir. 1969). We specifically found that Knoxville's plan of neighborhood integration was constitutional. The plaintiffs did not seek Supreme Court review of that decision.

We make this review to make clear why we do not by our remand direct the District Judge to decree that the Knoxville school authorities forthwith put into effect the detailed formulae set out in the plaintiffs' current motion. We will not impose a rigid timetable for the accomplishment by Knoxville of whatever may replace or revamp the neighborhood zone plan, should the District Court consider that 1971 *Swann* requires revision. We observe no crisis in the Knoxville school system that can be met only by plans hastily fashioned to be ready for the fall term of 1971. Such effort might invite fresh attacks by plaintiffs and bring on new rounds of litigation, the expense of which, including the fees of plaintiffs' attorneys and experts, would be underwritten by the Knoxville school system. We have confidence that the District Judge will move with proper dispatch to bring about a new system that will follow the commands as well as the exhortations of the *Swann* (1971) and companion cases.

## II

North Carolina State Bd. of Ed. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) announces that any state statute or constitutional provision that forbids the transportation of school children by bus or otherwise to accomplish a better racial balancing of school population will be denied enforcement. Swann v. Charlotte-Mecklenburg, *supra*, 402 U.S. 1, 91 S.Ct. 1267 (1971), approved a District Court ordered plan for the busing of children to improve the racial mix in the involved school system. It did not, however, direct that a plan of transporting school children must be a part of every new plan for improvement of the objective of desegregation.

## III

*Swann* (1971) makes clear that the constitutional prohibition against assigning students or teachers on account of race is applicable only to *minority* groups. Even though it has been said that the desiderata of the *Brown* rule are ·that we have no black or white schools—only schools—and that public officials be "color blind" in discharging their duties, until these desiderata have been accomplished race will have to be considered in arranging today's school society. In the last decision prior to *Swann* (1971) that dealt with this question—Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1969)—the Supreme Court's opinion said:

> "Each of the school districts here involved may no longer operate a dual system based on race or color, and directing that they begin immediately to operate as unitary school systems within which *no person* is to be effectively excluded from any school *because of race or color.*" 396 U.S. at 20, 90 S.Ct. at 29. (Emphasis supplied.)

In Swann v. Charlotte-Mecklenburg Bd. of Ed., *supra*, the dimension of this constitutional right is narrowed, at least until the elimination "root and branch" of the former *de jure* segregation.

> "Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil *of a racial minority* from any school, directly or indirectly on account of race * * *." 402 U.S. 23, 91 S.Ct. at 1279.

The thought is expanded in North Carolina State Board of Ed. v. Swann et al., 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), where the Court said:

> "Just as the *race* of students must be considered in determining whether a

constitutional violation has occurred, so also must *race* be considered in formulating a remedy." 402 U.S. 46, 91 S.Ct. at 1286.

It is clear, therefore, that in carrying out a busing plan to accomplish a fixed or approximate racial balance—now clearly approved by *Swann*—some white children must be moved out of the schools of their families' long time neighborhood, solely because they are white. Likewise, it may be that some Negro children will be compelled to give up attendance at a school in which they would prefer to remain. In Swann v. Charlotte-Mecklenburg Board of Education, 306 F.Supp. 1291, the District Judge disposed of objections by both black and white to his plan in this way:

"A correspondent who signs 'Puzzled' inquires:

'If the whites don't want it and the blacks don't want it, why do we have to have it?'

The answer is, the Constitution of the United States." 306 F.Supp. at 1293.

It would appear, therefore, that some disparate treatment in favor of racial *minorities* must be tolerated until the "vestiges" of *de jure* segregation have been eliminated. In *Swann*, 1971, Chief Justice Burger said:

"At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in *Brown* I. The systems will then be 'unitary' in the sense required by our decisions in *Green* [Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] and *Alexander.*

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." 402 U.S. 31–32, 91 S.Ct. at 1283.

## IV

■ *Swann* (1971) fixes no formulae for what must be done or what will be acceptable in efforts to arrive at a better racial mix in the schools. It does, however, lay on school authorities the duty to take some affirmative action toward improvement. While the existence of some all black or all white schools is not struck down as per se *intolerable,* school authorities will have to justify their continuance by something more than the accident or circumstance of neighborhood. Consideration of pairing of school zones, contiguous or non-contiguous, should be given; arrangement of new construction so as to further desegregation will be a legitimate objective, not to the detriment, however, of the discharge of school authorities' total and overriding responsibilities. This we urged, but did not particularize any command, when we last remanded this to the District Court. The District Judge who has handled this case can understand the commands and admonitions that come freshly to the Courts by these latest Supreme Court decisions. We need not construct a set of rules that will provide better guidelines than did the Supreme Court in these latest landmark decisions. The Supreme Court's opinion forbids an attempt by us to dictate just what racial mix should be arranged.

"The District Judge went on to acknowledge that variation 'from that norm may be unavoidable.' This contains intimations that the 'norm' is a fixed mathematical racial balance reflecting the pupil constituency of the system. If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. *The constitutional command to desegregate schools does not mean that every school in*

*every community must always reflect the racial composition of the school system as a whole."* Swann et al. v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 23–24, 91 S.Ct. 1267, 28 L.Ed.2d 554. (Emphasis supplied.)

### V

*Swann,* 1971, forbids the use of our decisions in Deal v. Cincinnati Bd. of Ed., 369 F.2d 55 (6th Cir. 1966), cert. denied 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114 and Deal v. Cincinnati Bd. of Ed., 419 F.2d 1387, cert. denied because of late filing, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128, to justify a plan of desegregation in a state which employed *de jure* segregation until the *Brown* decision. Likewise the Seventh Circuit decision in Bell v. School City of Gary, Ind., 324 F.2d 209 (7th Cir. 1963), cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L. Ed.2d 216, may not be relied upon for such purpose. In those cases the states involved had, long prior to *Brown,* abolished state-imposed segregation. The segregation complained of in those cases resulted, not from discrimination by Boards of Education, but primarily from residential patterns over which the Board had no control and for which it was in no wise responsible. In *Deal* I and II we held that the Board could not be faulted for the socio-economic levels of our society and that the Constitution did not require the Board to take affirmative action to eradicate segregation caused thereby in order to maintain racial balance in the public schools. We construed the Constitution as prohibiting discrimination. Chief Justice Burger recognized the distinction between *de jure* and so-called *de facto* segregation in *Swann* and limited the holding to the former. We need not ponder whether this prophesies that a different rule will ultimately emerge, applicable only to states not having the remnants of *de jure* segregation.

We conclude by expressly withholding any direction of any particular time-tables in which Knoxville must conform to what is directed by the latest Supreme Court opinions. With great respect for an opposite view, we are satisfied that until these decisions of 1971 there was quite respectable opinion that the *Brown* decision was satisfied by the neighborhood plan of school zoning. In a District Court opinion in Swann v. Charlotte-Mecklenburg Bd. of Ed., *supra,* it is said:

> "For years people of this community and all over the south have quoted wistfully the statement in Briggs v. Elliott, D.C., 132 F.Supp. 776 by Judge John J. Parker (who at his death was one of my few remaining heroes) *that though the Constitution forbids segregation it does not require integration.* Passage of time, and the revelation of conditions which might well have changed Judge Parker's views if he had lived, have left Judge Parker's words as a landmark but no longer a guide." 306 F.Supp. at 1294. (Emphasis supplied.)

Therefore, if it has taken the federal judiciary of this country 17 years to come up with final answers, it would be judicially arrogant for us to tell the school authorities of Knoxville to get the job done in the few months that will be available before the opening of the 1971 fall session. Plaintiffs urge that we direct the District Court and authorize plaintiffs to employ an expert or experts to draw the blueprint for obedience to *Swann's* directions. We do not know where you obtain or what creates such experts. Across the land today experts can be hired to sustain the colliding positions of the adversaries in most any contest. We will not insist that the District Judge discharge his responsibilities by resolving contests between hired experts.[1]

---

1. We do believe, however, that the District Court should now require the school board to prepare and maintain a pupil locater map.

The hope, or dream, that one day we will have become a people without any motivations born of our differing racial beginnings will have a better chance of fulfillment if patience accompanies our endeavors. Strident and truculent judicial commands could indeed exacerbate what may now remain of racial bias and prejudice.

In the first reported case involving desegregation in Knoxville, Goss v. Board of Education, 186 F.Supp. 559 (E.D. Tenn.1960), Judge Taylor in emphasizing his own awesome responsibilities said:

"As the case has developed, the ultimate responsibility for decision rests with the Court. It alone must deal with the realities—realities with which it has had acrid experience.

"If it decides wrongly, the transition toward the goal of a harmonious and unified school system—a goal to which all parties to this case subscribe—will receive an untold setback. If it decides rightly, there may well be smooth and steady progress toward full integration. Some individuals, parties to this case, will not themselves benefit from the transition. At a turning point in history some, by the accidents of fate, move on to the new order. Others, by the same fate, may not. If the transition is made successfully, these plaintiffs will have had a part. Moses saw the land of Judah from Mount Pisgah, though he himself was never to set foot there." 186 F.Supp. at 569.

We remand this case to the District Court for further proceedings consistent with Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, and the other relevant Supreme Court opinions announced on April 20, 1971.

The parties shall bear their respective costs on this appeal.