Josephine GOSS et al.

v.

**BOARD OF EDUCATION, CITY OF
KNOXVILLE, TENNESSEE, et al.**

Civ. A. No. 3984.

United States District Court,
E. D. Tennessee, N. D.

March 8, 1972.

Avon N. Williams, Jr., Nashville, Tenn., Carl A. Cowan, Knoxville, Tenn., Jack Greenberg, New York City, for plaintiffs.

S. Frank Fowler, Sam F. Fowler, Jr., W. P. Boone Dougherty, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This lawsuit commenced December 11, 1959, over twelve years ago. While a detailed account of its early history is set out at D.C., 270 F.Supp. 903, 904–912 (1967), a brief recitation of that history will place the issues in proper perspective.

### Judicial History

On April 8, 1960, the defendant submitted a grade-a-year desegregation plan effective September, 1960. This plan was approved after an extended evidentiary hearing. D.C., 186 F.Supp. 559. That decision was modified by the Court of Appeals to require acceleration of the grade-a-year schedule. However, the Court of Appeals expressly approved the neighborhood ·pupil assignment system. 6th Cir., 301 F.2d 164, 168–169. The defendant amended the plan on June 25, 1962, and March 14, 1963, to accelerate the schedule.

On May 11, 1964, defendant adopted a plan for complete desegregation effective September, 1964. Each child was to be assigned to the school "designated for the district in which he or she legally resides," and that "districting [was to be] based on the location and capacity (size) of school buildings and the latest enroll-

ment studies." In order to preserve continuity of education, children whose assignment was altered by the plan were permitted to complete the grade sequence where they were before transferring to a new school. This was called the "grade-requirement" transfer.

On May 8, 1967, plaintiffs filed a motion requesting the defendant to provide an equitable distribution of all racial and socio-economic elements in the population within each school in the system. After a full evidentiary hearing, the Knoxville school system was found to be fully desegregated under the plan in effect since the school year 1963–64. D.C., 270 F.Supp. 903, 918. In that opinion, we expressed the view that:

" . . . there is no constitutional duty on the part of the school board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance which it did not cause, nor is there a duty to select new school sites solely in furtherance of such purpose . . . " 270 F.Supp. 903, at 916–917.

Believing our responsibility to be discharged, we struck the case from the docket. This decision was affirmed in all respects except that we were instructed to keep the case on the docket to insure future compliance with *Brown I.* 6th Cir., 406 F.2d 1183, 1191 (1969).

On November 17, 1969, plaintiffs filed a motion for immediate relief based on *Alexander v. Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). At the pretrial conference, proof was limited to alleged discriminatory developments since the decision of June 7, 1967. After the evidentiary hearing, we found that the building program was consistent with the neighborhood school system approved in 1967, and that the defendant was operating a unitary system within the meaning of *Alexander.* D.C., 320 F.Supp. 549, 561–562 (1970).

This decision was on appeal when *Swann v. Charlotte-Mecklenburg Board* of *Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and its companion cases were filed. Without reviewing our decision, the Court of Appeals remanded the case on June 22, 1971 "for further proceedings consistent with *Swann . . . and the other relevant Supreme Court opinions announced on April 20, 1971.*" (Emphasis added) 6th Cir., 444 F.2d 632, 640.

Immediately thereafter, plaintiffs presented to Mr. Justice Stewart a motion for immediate relief. He denied the motion because we had not had an opportunity since the remand order "to inquire whether respondents have *failed to maintain* a unitary school system as defined in *Swann . . . and prior cases.*" (Emphasis added) His order states that if *it is found* that defendant has not *"maintained a unitary school system,* [it] must *'terminate dual school systems at once,'* " citing *Alexander,* supra. (Emphasis added)

On August 16, 1971, a pre-trial conference was held and an order entered defining the issue as whether defendant had maintained a unitary system within the meaning of *Swann.* Defendant agreed to construct a pupil locator map as suggested by the Court of Appeals. 444 F.2d 632, at 639, n. 1. The evidentiary hearing was set for September 7, 1971.

Difficulties in completing the pupil locator map caused a continuance to October 21, 1971. Plaintiffs' expert witness' inability to complete his preparation caused a continuance to December 1, 1971. Then, after three full days of testimony, plaintiffs moved for the joinder of the Mayor and City Council of Knoxville as co-defendants. The motion was granted and the hearing was recessed to permit service on the proposed new defendants. On December 15, 1971, these parties appeared by attorney, agreed to their joinder, but requested a continuance to study the record already accumulated and otherwise prepare their case. Their request was granted and the hearing resumed January 31, 1972. Com-

pletion of the hearing was delayed until February 3, because of the inability of plaintiffs' chief witness to be present before that date.

The history of this case, unlike that in *Swann*, reveals that the Court has had the full cooperation of the defendant Board of Education in the effort to satisfy the constitutional mandate of *Brown I* and subsequent Supreme Court cases.

### Pupil Locator System

The pupil locator system has the capability of locating the residence of each pupil within 1000 feet of the address on his enrollment card and identifying him by race and grade level. The data used came from the initial enrollment in September, 1971. It contains the normal mistakes made in initial enrollments and does not show 2700 to 2800 pupils who live in Knox County but attend school in the City. Consequently, it is 3000 to 4000 pupils below actual enrollment. The computer print-outs used in making the maps show the number of pupils of each race, at each grade level, living within each 1000 foot square. It also shows totals and percentages for each square.

Two pupil locator maps were created from the information contained in the print-outs. For both maps a grid was superimposed on a map of Knoxville and each square given a number corresponding to one on the print-out. One map shows the total number of white pupils and the total number of black pupils living in each square and attending a City school. The other is a color schematic map that reveals the degree of racial concentration by residence within each square. In addition, three transparent overlays were prepared which show the school zone boundaries at the elementary, junior high and senior high level, as well as the percentage of blacks attending each school.

### Topography

Knoxville's central business district is located at the approximate center of the City on the north shore of the Tennessee River. At that point two bridges connect South Knoxville to the business district. Apart from these bridges, South Knoxville is separated from the rest of the City by the river.

The business district is a grid of streets nine city blocks in from the river and six city blocks parallel to it. East of the business district is a basin and hill of largely uninhabited land. This land is undergoing redevelopment as the Mountain View Urban Renewal Project. At the top of the hill is the now isolated Green Elementary School. North of the district is the Southern Railway Depot and to its north is an east-west (actually southwest to northeast) four lane, divided, interstate highway (I–40). At the northwest corner of the business district is a complex rail and highway interchange. A basin containing the Louisville and Nashville Railroad (L & N) freight yards is on the west side of the business district.

The east-west interstate highway cuts the City north of the river into northern and southern sections. West of the business district this highway also carries north-south interstate traffic as I–75. At the northwest corner of the business district these highways separate. I–75 travels northwest paralleling to its east a Southern Railway track. I–40 East travels northeast paralleling another Southern Railway track to its north.

At the southwest corner of the business district the river makes a "U" shaped bend. Most of the land in this bend is owned or utilized by The University of Tennessee. A bridge crosses the river into the County at the western end of this bend. It carries the four-lane divided Alcoa Highway which is an off-shoot of the interstate. The L & N Railroad track parallels Alcoa Highway at this point west of the University. The land bordered by Alcoa Highway and the L & N on the west, the interstate on the north, the business district on the east and the river on the south is known as the Ft. Sanders-UT area.

In addition to the interstates there are six major traffic arteries emanating

from the business district to the outlying suburbs. These are: Chapman Highway (S), Kingston Pike (SW), Western Avenue (W), Central Avenue (NW), Broadway (N), and Magnolia Avenue (NE). These streets have substantially greater traffic capacity than the other streets of the City. In order to get from one outlying section to another noncontiguous section, it is usually necessary to travel to the center of the City on one of these streets, or one of the interstates, then back out on another artery. This street pattern creates intense traffic congestion in the inner city and on the main arteries.

Except for the central business district, the Mountain View project, the UT-Ft. Sanders area, and along the main traffic arteries, most of the land within the City is residential property.

Along I-40 there are twenty points where one can cross under or over the highway. Fourteen are west of the business district and six are east of it. Only three are east of the urban renewal project; whereas ten are west of the Ft. Sanders-UT area. Most of the latter are in the extreme west because of a steep ridge that parallels I-40 on its southside, west of the Alcoa Highway interchange. The Southern Railway right-of-way appears to have restricted crossovers in the east. I-75 North has three east-west cross-overs. Otherwise, it, and the railroad, separate the north-central and northwestern parts of the old city.

Nearly three miles out I-75 North, the highway converges with the railroad to pass through Sharp's Gap. The Gap is a break in a steep ridge that separates Inskip and Lincoln Park northeast of I-75 and separates Norwood and Lonsdale southwest of I-75. The ridge is too steep for traffic and has no roads crossing it. It extends nearly a mile southwest of the Gap in an undeveloped, rural area. This land is crossed by two narrow farm roads west of the ridge.

There is extensive undeveloped land in the western and northwestern suburbs annexed from the County in 1963. These include Rocky Hill, West Hills, Bearden, Middlebrook, Third Creek, Ridge Dale, Pleasant Ridge and Norwood. These sections are experiencing rapid residential development.

It is obvious from this data that the geography in Knoxville is substantially more complex than that found in Davis v. School Comm'rs of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); that Knoxville is geographically segmented by natural and man-made boundaries; and that outlying residential areas in the west and northwest are under-developed.

### Demography

In a broad sense, East Knoxville is the area north of the river, south of the eastbound Southern Railway right-of-way, and east of the Mountain View project. In a narrow sense, it refers to the black community immediately east of the Mountain View project and south of Magnolia Avenue. The area north of Magnolia has been known as Park City. Approximately one and a half miles to its northeast lies the Burlington community. Roughly a mile due east of Burlington is the Holston Hills suburb. Southeast of Burlington and southwest of Holston Hills is an area sometimes referred to as Holston Heights. In subsequent discussion these restricted names will be intended unless "greater East Knoxville" is mentioned.

The 1970 United States Census divides greater East Knoxville into seven tracts for enumeration purposes. These tracts do not correspond to the accepted community boundaries described above. The data for each tract shows the proportion of blacks to total population in the tract as a whole. A racial mixture in a given tract is not evidence of an integrated neighborhood because it ignores neighborhood cohesiveness. Thus, the census reports provide only a general indication of residential patterns.

With this caveat, the 1970 census shows all of greater East Knoxville as having black residents. The heaviest

concentration is in the tract immediately east of the Mountain View project. It is 95% to 100% black. Adjacent tracts range from 25% to 49% black to 75% to 94% black. And, outlying tracts are 6% to 24% black to 25% to 49% black. This data indicates an all-black neighborhood in East Knoxville which extends as a narrow band into Burlington. There is a substantial black minority in both Park City and Holston Heights. Except for the northeastern extension of East Knoxville, Burlington has few blacks. The tract that encompasses Holston Hills extends west into Holston Heights. It is 25% to 49% black. There is a permissible inference that the blacks in Holston Hills are concentrated along its western edge.

The 1960 United States Census shows East Knoxville as 75% to 94% black and extending towards, but not into, Burlington. Park City and Holston Heights were 75% to 94% white. Burlington was 95% to 100% white. Since the 1960 census used fewer tracts in greater East Knoxville than did the 1970 census, a comparison of the two reports is misleading. The apparent increased black concentration in East Knoxville is probably the result of a smaller tract in the later census. Two conclusions, however, are obvious. In 1960, Holston Hills and much of Holston Heights were not within the city limits. Secondly, there has been a major expansion of blacks into most of greater East Knoxville between the two census.

In the northwest pocket created by the junction of I–40 and I–75 lies a community known as Mechanicsville. To its immediate north, and west of I–75 North, is the Beaumont community. North of Beaumont is the Lonsdale community. Beaumont and Lonsdale are separated by an industrial and rail strip along Tennessee Avenue. To Lonsdale's north is the southwest extension of Sharp's Ridge which separates Lonsdale from Norwood.

The 1970 census shows Lonsdale to be 50% to 74% white, and Beaumont to be 95% to 100% white. The eastern Mechanicsville tract is 75% to 94% black and the western tract is 50% to 74% black. The Lonsdale and Beaumont tracts in 1970 are the same size and have basically the same racial mixture as they had in the 1960 census. Mechanicsville, on the other hand, was 50% to 74% black in 1960. It appears that Mechanicsville's black community has increased by 27.1% in the east and 5.6% in the west between 1960 and 1970.

All other parts of Knoxville are 95% to 100% white in both the 1960 and the 1970 census reports.[1] The 1970 census shows Knoxville's population to be 13% black. Dr. Karl Taeuber, creator of a census segregation index, testified that since 1940 each census demonstrates that Knoxville has had a high degree of residential segregation.

The Board's color schematic pupil locator map, although limited to school children, shows more precisely the geographic distribution of the races than do the census maps. While consistent with the census maps, the pupil locator map reveals facts not evidenced by the census materials. First, Lonsdale is racially segregated. Its western half is predominantly black, and its eastern half is predominately white. Second, most of Beaumont has a slight black minority. Third, most of the eastern Mechanicsville tract is predominately white.[2] Fourth, north-central Knoxville, the pocket between I–75 North and I–40 East has a black minority, albeit less than 5%. Fifth, the bulk of Holston Hills is all-white; only its western edge has black

1. The business district and the Mountain View project area have so few residents that their racial mixture is insignificant relative to the other census tracts.

2. This apparent discrepancy with the census data is explained by the fact that the predominately white pupil locator grid squares have few students and the predominately black squares have many. This situation demonstrates a serious shortcoming of all these maps: They fail to correlate racial distribution with population density.

residents. Sixth, isolated black children are scattered over the rest of the City.

The preliminary 1970 census found 174,587 residents of Knoxville and 276,293 residents of Knox County. Testimony indicates that East Knoxville has 11,500 black residents, Mechanicsville has 6,500 and Lonsdale has 6,000.

The 1963 annexation tripled the size of Knoxville from 21 to 77 square miles. Of the 22,005 households in the annexed areas in 1970, 21,873 were white. On a household basis, between 1960 and 1970, Knoxville's black community was reduced from 16.7% to 11.8% of the total population.

Some of the black movement into greater East Knoxville was caused by the displacement of 1080 black households from the Mountain View project area. Over half of these households were relocated in public housing projects in East Knoxville. Most of the remaining household units moved east towards Burlington.

The following conclusions can be reached from the preceding population data: (1) the black population of Knoxville is a small proportion of the total population (13%); (2) Knoxville's black population is residentially segregated into three geographic areas; and, (3) except for the expansion of the East Knoxville black community, essentially identical concentrations existed at the first hearing of this case in 1960.

Urban Renewal is a federal program which attempts to rebuild an area with 50% or more substandard structures that are beyond rehabilitation. These projects are overseen by the Department of Housing and Urban Development (HUD) and the Knoxville Housing Authority (KHA). KHA's role in these projects is limited to land acquisition, relocation of residents, public improvements and approval of private redevelopment plans.

The Mountain View project, as previously mentioned, is in the redevelopment stage. Fifty-four acres of this project area are designated for 400 FHA 236 apartments for low and moderate income tenants. The one-bedroom apartments will rent for $115.00 per month. Two hundred units are under construction and will be available for occupancy around March, 1972. Construction of the remaining units will commence when the weather breaks this spring. The convenient location of these apartments relative to the business district is the basis for the prediction that they will attract white moderate income tenants as well as black tenants. A predominately white but reasonably integrated neighborhood is expected to evolve.

Execution of a new urban renewal project, the Morningside project, began June 30, 1971. This project area is just east of the Mountain View project between the river and Magnolia Avenue. It contains 355 acres, 1000 household units, and is 95% black. The goal of this project is redevelopment of the neighborhood for the people who already live there. It is expected to remain predominately black.

The existence of these projects creates a fluid residential situation in East Knoxville which precludes accurate prediction of future patterns.

*Changes in School Enrollment Patterns*

The overall racial composition of the Knoxville schools ten years ago, the year following annexation and the present school year is:

| Year | Total | White | Black | Percentage Black |
|------|-------|-------|-------|------------------|
| 1961–62 | 20,478 | 15,852 | 4,626 | 22.1% |
| 1963–64 | 39,409 | 34,019 | 5,390 | 13.6% |
| 1971–72 | 34,876 | 29,109 | 5,767 | 16.5% |

These enrollment figures reveal several facts. Annexation nearly doubled total enrollment and reduced the overall proportion of blacks by 8.5%. Since annexation the system has lost 4,533 pupils, or 11.5%, of its annexation enrollment. This loss reflects the departure of 4,910 white pupils (14.4% of annexation white enrollment) and the gain of 377 black pupils. The net effect is a 2.9% increase in the proportion of blacks in the City system.

This year the Knox County schools have a total enrollment of 23,702. Since annexation the County system has gained 6,066 pupils. Its average annual gain for this period (658 pupils per year) contrasts with the City system's average annual loss (567 pupils per year). This corroborates the testimony of witnesses that the City system is losing pupils through out-migration to the County. Since annexation, the proportion of blacks in the County system has remained around 1% while the proportion in the City has increased from 13.6% to 16.5%. Further, since desegregation of the County schools in 1965–66, the actual number of blacks in that system has decreased.

In 1960–61, out of forty-one schools in the City system there were 23 schools in which all the pupils were white and 10 in which all pupils were black. There were thirty black children, or 0.6% of the black enrollment, attending the eight integrated schools. In that year there were no schools with integrated staffs. That was the first year under the grade-a-year plan approved by the Court.

In 1965–66, out of 65 schools there were 23 schools in which all pupils were white and 9 schools in which all pupils were black. There were 2648 black children, or 45.6% of the black enrollment, attending 33 integrated schools. In that year, there were 11 schools with integrated staffs.

In 1970–71, out of 64 schools, there were 17 schools in which all pupils were white and no schools in which all pupils were black. There were 6,019 black children, or 100% of the black enrollment attending 47 integrated schools. That year found 51 schools with integrated staffs.

This year, 1971–72, out of 64 schools, there are 16 schools in which all pupils were white and no schools in which all pupils were black. There were 5767 black children, or 100% of the black enrollment, attending 48 integrated schools. All schools have integrated staffs.

This record is indicative of the Knoxville School authorities' effort to comply with the judicial directive to desegregate. It is in sharp contrast with the situation in Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 7, 91 S.Ct. at 1272, 28 L.Ed.2d 554 where all parties agreed that the system "fell short of achieving the unitary school system that [Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its companion cases] require." The desegregation plan in that case had a "free transfer provision" which rendered the plan illusory. (Free transfer provisions were declared unconstitutional in Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).) Knoxville does not have a free transfer provision.

### The Existing Neighborhood Pupil Assignment System

Beardsley Junior High and Cansler Elementary School are next door to each other in Mechanicsville; Maynard Elementary is four blocks east of Cansler; Moses Elementary is four blocks east by south of Maynard, or nine blocks from Cansler. Cansler has a 98.3% black enrollment; Maynard has a 94.6% black enrollment; and, Moses has a 79.8% white enrollment. This reflects the residential composition of their respective zones.

Because of the relative proximity of these schools, they have excess classroom space. However, in addition to its regular programs, the Moses plant contains a pre-school program and the Van Gilder School.[3] Cansler has a pre-school program and a special education program in addition to its regular program. Maynard has a nursery program. Due to these special programs there is only one vacant classroom at these three schools. Beaumont Elementary School is seven

---

3. Van Gilder is a special program for children with emotional learning blocks. It needs additional classroom space.

and a half blocks north by west of Maynard, six and a half blocks northeast of Cansler, and ten blocks northwest of Moses. It has an extensive severely mentally retarded program (149 pupils) and no vacant classrooms. The nearest elementary school to Beaumont's north is Lonsdale, one mile to its northwest. Beaumont is 13.3% black. Sam E. Hill Elementary is three blocks southwest of Lonsdale. It is 96.6% black, while Lonsdale is 13.1% black. The extreme proximity of these schools and residential segregation in their zones necessitate some disparity in their relative racial composition. Under the circumstances the zone lines for these schools are reasonably drawn and the racial composition of each school corresponds to the composition of its zone.

Turning to East Knoxville, the Mountain View Elementary plant is eight blocks east of Green; Eastport is five blocks northeast of Mountain View and thirteen blocks east by north of Green. These three school sites have been in use for as long as there are school records, that is, back into the last century. Throughout the past decade each of these schools has had a predominately black enrollment. Eastport has always had a black enrollment. From 1965–66 to 1969–70 Green experienced a heavy enrollment loss due to the Mountain View project displacement. In 1970–71 the Mountain View school closed and Green's enrollment jumped by 203 pupils. However, this year its enrollment is down 82 pupils. ·

Moving into greater East Knoxville, Park Lowery Elementary School serves the Park City neighborhood. It is six blocks north by west of Eastport and a mile northeast of Green. Fair Garden Elementary School serves the Burlington area. It is sixteen blocks (1⅔ miles) northeast of Park Lowery and eighteen blocks northeast of Eastport. Robert Huff Elementary School serves the Hols-

ton Heights area and was annexed from the County. It is one mile south by east of Fair Garden and one and a third miles due east of Eastport on the southeastern City limits. Robert Huff will be replaced by the new Sarah Moore Green School on the latter's completion. The construction site is one thousand feet northwest of the present Robert Huff plant. Chilhowee Elementary School was also annexed from the County. It serves Holston Hills and is one and a half miles northeast of Fair Garden. Each of these schools enrolled only white children when this lawsuit began. Yet each has since acquired a substantial black minority as shown below on a percentage basis:

| | Park Lowery | Fair Garden | Robert Huff | Chilhowee |
|---|---|---|---|---|
| 1961–62 | 1.1 | 0.2 | — | — |
| 1962–63 | 2.5 | 1.0 | — | — |
| 1963–64 | 1.8 | 2.9 | 0 | 0 |
| 1964–65 | 2.7 | 4.2 | 0 | 0 |
| 1965–66 | 40.9 | 27.7 | 4.4 | 0 |
| 1966–67 | 50.8 | 50.0 | 9.2 | 0 |
| 1967–68 | 58.9 | 63.0 | 15.1 | 1.4 |
| 1968–69 | 65.3 | 77.7 | 15.7 | 4.1 |
| 1969–70 | 66.8 | 79.1 | 21.6 | 6.4 |
| 1970–71 | 66.0 | 83.4 | 27.0 | 10.8 |
| 1971–72 | 69.3 | 86.0 | 27.8 | 18.7 |

The increasing percentage of black children in these schools is consistent with the changes in residential patterns in their respective zones as shown by successive census reports. With one qualification [4], these figures show an influx of blacks in Park City and Burlington. The expansion has leveled off in Park City but is continuing in Burlington. There has been a slow but steady movement of blacks into Holston Heights. More recently the movement has extended into Holston Hills and last year became greatly pronounced.

In summation, the elementary school zones in greater East Knoxville are reasonable in light of the relative distances between these schools. The racial composition of each school reflects both the present residential composition of its zone

4. Despite complete desegregation in 1964–65, the "grade-requirement" transfer, then permissible, prevents realistic correspondence between enrollment figures and residential distribution for that year. The next year is a more realistic base.

and the changes within the zone for the past seven years.

The County school system does not have a junior high school system. Therefore, Robert Huff and Chilhowee, which were annexed from the County, have eight grades instead of six grades found in schools that have always been City schools. As a result Vine and Park Junior High Schools, which serve the rest of greater East Knoxville, have a higher proportion of blacks than they might otherwise be expected to have. Park is 64.4% black and Vine is 99.8% black. These schools are seven blocks apart. Both are between Green and Eastport.

East and Austin Senior High Schools were fed by Park and Vine Junior High Schools, respectively, until their consolidation in 1968–69. The combined enrollment figures for these two schools were 51.2% black in 1961–62 and remained around that level until 1965–66 when it rapidly rose to the 99% level. More significant is the fact that combined enrollment for these schools declined from 1196 in 1961–62 to 697 in 1971–72.

The pupil locator map discloses that 291 more white children attending City schools live in the Austin-East Senior High School zone than attend schools within the zone. The shortage appears to be at the senior high level. Many of these children have vocational transfers to Fulton, the system's only comprehensive vocational high school. The Fulton zone is 2% to 3% black, yet the school's enrollment is 10.2% black. This discrepancy is clearly attributable to vocational transfers. Vocational transfers, however, do not account for all the shortage. There are indications that the balance can be found at Holston High. No evidence was introduced to show whether school registration procedures include a determination that the registrant resides within the appropriate attendance zone. It is possible that transfer procedures can be circumvented. The evidence is clearly insufficient to explain the situation.

Knoxville has been on a residential pupil assignment system basis as long as there has been a public school system in Knoxville. This situation is in contrast with the Charlotte-Mecklenburg County system, which only adopted a neighborhood system in 1965.

The facts just enumerated demonstrate that the racial composition of each school with predominately black enrollment is consistent with the previously approved neighborhood pupil assignment system. Of the thirty schools with enrollments in excess of 99.0% white children, twenty-five are in South Knoxville or the annexed suburbs. The other five schools are located in neighborhoods without black residents. The remaining twenty-seven schools have varying racial mixtures and are located in neighborhoods that reflect their respective mixtures. Thus, the racial composition of the schools corresponds to the residential patterns within each school zone. A substantial increase in the racial mixture of nearly every school would require massive bussing of children.

*The Latest Changes: Effective, September, 1972*

In the summer of 1971, the Board, in an effort to comply with the new guidelines laid down in Swann v. Charlotte-Mecklenburg Board of Education, amended its desegregation plan to establish the following policies:

1. Authorized the creation and maintenance of a pupil locator map.

2. Established a policy of assigning faculty and supporting staff, insofar as is administratively sound, to have the faculty of each school reflect the racial balance of the school system as a whole.

3. Revised transfer policy to permit only two classes of transfers: (1) vocational or special education transfers and (2) majority to minority race transfers. These transfers must be renewed annually and will be honored only so long as the transfer basis remains valid.

4. The following zone adjustments were made:

(a) Pair Sam E. Hill and Lonsdale Elementary Schools;

(b) Move the severely mentally retarded program at Beaumont and the pre-school program at Moses to Cansler; and close the regular program at Cansler by dividing its regular pupils between Beaumont and West View (West View is 100% white);

(c) Move the regular program at Moses to Maynard and expand the special education program at Moses;

(d) Organize Beardsley as a two-year junior high and Rule as a four-year senior high serving the present Rule-Beardsley attendance zones;

(e) Move the Austin-East zone line further east;

(f) Pair the vocational programs at Austin-East and Fulton;

5. Assured election of minority race cheerleaders.

The Board has agreed to and will pay transportation expenses of all students who transfer under the majority to minority transfer provision. See 402 U.S., at 26–27, 91 S.Ct. 1267, 28 L.Ed.2d 554.

Although the proposed zone adjustments were adopted prior to creation of the pupil locator map, the map shows that they will improve the racial mixture in the affected schools. The Board declined to alter the elementary zones in East Knoxville until the new Sarah Moore Green School, now 15%–20% complete, is ready for occupancy. The racial balance of the affected neighborhood is in a state of flux. Further, the impact of the 400 residential units in the Mountain View project area is unknown at the present time. These uncertainties preclude a meaningful zone adjustment in East Knoxville at this time.

### The Trotter Plan

After adopting these zone changes, the Board retained Dr. Charles Trotter, a professional educator [5], to prepare a school zone map from the pupil locator data that would achieve the maximum racial mix without bussing children. Except for two major differences, his zone map is essentially the same as that adopted by the Board. Dr. Trotter zoned 150 white pupils living in Norwood to Rule High School. These children are presently being transported to West High by the County under the Local Sales Tax Agreement. Assistant Superintendent Bedell testified that this suggestion was not adopted because of distance and safety factors. In order to get from Norwood to Rule it is necessary to make two crossings of an interstate highway at a cloverleaf with no crosswalks. In addition, if zoned to Rule these children would live less than one and one-half miles from the school and would not be eligible for County transportation.[6] The other major difference is that Dr. Trotter adjusted zone lines in East Knoxville based on present pupil location data.

Dr. Trotter testified that the residential concentration of blacks in Knoxville into three geographically well-defined areas made it impossible to obtain the same degree of racial mixing in each school with a neighborhood pupil assignment system. He said that improvement

5. Dr. Trotter is a school curriculum and buildings expert who is employed as Director of the University of Tennessee School Planning Lab. The Lab assists school systems that are planning new programs or designing new buildings. He is presently evaluating another system's curriculum in light of a recent bussing order. Dr. Trotter lives in Maryville, Blount County, Tennessee.

6. The City-County Local Sales Tax Agreement reads in pertinent part:
"After the adoption of the sales tax by the referendum, the County will, without charge to the City, provide transportation by bus to and from school for all pupils living in neighborhoods which were furnished such transportation by the County School System prior to . . . annexation . . . and who live one and one-half (1½) miles or more from the schools attended. The County will not be required to transport pupils to any school outside the particular school zone in which such pupils live or to which they are assigned in a contiguous school zone."

on his plan would require massive cross-town bussing.

### The Stolee Plan

Plaintiffs' expert, Dr. Michael Stolee [7], believes that a school system whose enrollment is 16.5% black must have a 10% to 30% black enrollment in each school in order to be desegregated. Since only eight schools in Knoxville meet this test, he concluded that Knoxville has a segregated school system. He said that it is not possible to have a good desegregation plan without bussing. Dr. Stolee introduced his plan which he asserts will effectively desegregate the Knoxville public schools.

Doctor Stolee has made some twenty school desegregation studies, forty additional school desegregation consultations, and is presently serving as a consultant to the Legal Defense Fund of the National Association for the Advancement of Colored People in three other school desegregation cases. (The Legal Defense Fund is representing plaintiffs in this case.) Throughout the three days defendants presented their proof in chief, Dr. Stolee sat within the bar and consulted with plaintiffs' counsel, as did Dr. Bedell who sat with defendant's counsel.

Dr. Stolee was provided a copy of the computer print-outs of the pupil locator data for use in preparing his plan. He said he did not use this information because it did not include the County children who attend City schools under provisions of the City-County Local Sales Tax Agreement.[8] Instead he relied on the current enrollment figures for each school and used existing elementary school boundaries for boundaries in his plan. The Court has studied the pupil locator data and realizes that a plan based on that information would require time-consuming, tedious, and exhausting effort. Dr. Stolee's failure to use this data substantially reduces the weight of his testimony.

On the elementary level, Dr. Stolee left alone the six schools that meet his test of an integrated school. The other elementary schools are divided into seven groups. Each of these "clusters" drew its attendance from the existing neighborhood zones of the schools assigned to the cluster. Each cluster included one school with a predominately black student body. Some of the clusters have contiguous zones, and others have non-contiguous zones. Each cluster has one school designated as a grade-center which serves all children at the designated grade level who reside in a cluster zone. Children at the designated grade level who do not reside within the grade-center's neighborhood zone are bussed to the grade center. Children who reside within the grade-center's neighborhood zone but are not at the designated grade level are bussed to other schools in the cluster. Dr. Stolee declined to suggest a basis for deciding to which school in the cluster the latter children should be assigned. Since only 16.8% of the total elementary school enrollment is black, and this is residentially concentrated, black neighborhood schools had to be selected as grade-centers if unnecessary bussing were to be avoided.[9]

---

7. Dr. Stolee is Associate Dean of the University of Miami (Florida) School of Education. He also is a professional school desegregation witness and consultant. His income from the latter employment is restricted to 20% of the salary paid him by the University of Miami. This condition of employment restricts his fees for outside consultations and court appearances to between $5,000 and $6,000 each year, exclusive of expenses. He testified that he expects $4,000 for his efforts in this case.

8. Section 3 of the agreement provides that a child living outside the corporate limits of the City may attend a school annexed by the City in 1963 tuition free, if the school is within two miles of his residence or if he would have attended that school had it remained a part of the County School System.

9. Dr. Stolee's original elementary school plan designated all the grade-centers as sixth grade centers. His amended plan designates three of them as first grade centers. The stated reason for the change was to avoid discrimination against black first graders by making them do most of the bus riding.

Doctor Stolee testified that 3684 elementary school children would be bussed under this plan. He later qualified this statement to indicate that this was only 75% of the elementary pupils who would be attending schools outside their neighborhood zone. He said that 25% of these 4912 children would make their own transportation arrangements.

He stated that these children would have to be bussed from one to six miles. On cross-examination, he admitted that he had not laid out bus routes or computed the mileage. Using Dr. Stolee's map, the Court located the most feasible routes between the most distant schools in six elementary clusters. It then measured the travel distance in each case. They were as follows: Norwood to Eastport, 7.9 miles; Shannondale to Fair Garden, 10.4 miles; Sterchi to Park Lowery, 8.8 miles; Rocky Hill to Maynard, 10.0 miles; West Hills to Cansler, 8.6 miles; Anderson to Green, 6.6 miles. These distances substantially exceed those estimated by Dr. Stolee.

More significantly we found only one feasible bus route in each of these cases. In each case, Knoxville's street patterns compel routing on the major traffic arteries at the hours of maximum traffic congestion. The Court is of the opinion that out of the aforementioned routes only the West Hills-Cansler route can be traveled in rush hour traffic in less than thirty minutes. The State Department of Education's regulations limit transit time for elementary school children to periods under thirty minutes.

The Stolee plan assigns junior high pupils to particular schools by a feeder system. Each junior high school zone encompasses specific, current elementary zones. Three of these zones are non-contiguous. Dr. Stolee testified that 990 pupils would have to be bussed in these three zones. In other words, 1320 children will attend a junior high school in a non-contiguous zone with 25% making their own transportation arrangements.

The Stolee plan converts Whittle Springs Junior High into a seventh grade center and pairs it with Christenberry Junior High. The Whittle Springs-Christenberry Junior High zone encompasses the non-contiguous Eastport Elementary zone. It also encompasses the "contiguous" Inskip Elementary zone. Sharp's Ridge separates Inskip from north-central Knoxville where Whittle Springs and Christenberry are located. This fact and the route that would have to be traveled from Inskip necessitate bussing from that neighborhood. (Inskip is 4.1 miles from Whittle Springs and 5 miles from Christenberry. Eastport is 5 miles from Whittle Springs and 3.2 miles from Christenberry.) Despite these facts, Dr. Stolee testified that no "additional transportation" would be needed in this zone. Since the Eastport children would have to be bussed to these schools, that statement is probably an oversight.

Regarding the bussing of children from Inskip to these schools, Dr. Stolee apparently assumed that the County could be compelled under the City-County Local Sales Tax Agreement to bus these children to Whittle Springs and Christenberry. This assumption is a legal conclusion which he is not competent to make.[10] Mr. Lewis Howard, an attorney,

All the testimony indicates that bus riding is harder on younger children than it is on older children. The amended plan substantially increases the total number of first graders that would have to ride a bus for the sole purpose of reducing the number of black first graders who would have to ride buses.

10. The language that probably would be controverted reads: "The County will not be required to transport pupils to any school outside the particular school zone in which such pupils live or to which they are assigned in a contiguous school zone." The Whittle Springs Christenberry zone lines as drawn by Dr. Stolee give the appearance of encompassing a contiguous Inskip community. However, a close examination of a map reveals that Inskip is not contiguous to the rest of the zone. Sharp's Ridge separates Inskip from Lincoln Park to its immediate south. (There are no direct

who in his capacity as City School Board member, testified that the Local Sales Tax Agreement is an illusive agreement that has been the subject of many differing interpretations since its inception. Since Dr. Stolee was present for Mr. Howard's testimony and had a copy of the transcript of it, he should have known that his assumption was questionable. Of course, he might not have relied on this assumption, in which case he overlooked the obvious need to bus children from Inskip.

Under the Stolee plan, the Beardsley Junior High zone is five miles long, with the Beardsley plant at the easternmost end. The children living in the western Cedar Grove and Pond Gap Elementary zones would have to be bussed to Beardsley. Dr. Stolee testified that no new transportation would be required in this proposed zone. This opinion is based on the legal conclusion that the County's obligation to bus children in the Cedar Grove and Pond Gap areas would require the County to bus these children to Beardsley if the zone lines were changed. This conclusion is questionable since the Local Sales Tax Agreement is easily interpreted as limiting the County's obligation to bus to those schools nearest the eligible child's residence. (Cedar Grove School is 1.9 miles from Bearden Junior High and 4.9 miles from Beardsley. Pond Gap is 1.4 miles from Bearden Junior High and 2.5 miles from Beardsley.)

In addition, Dr. Stolee apparently overlooked the need to bus children living in the Perkins Elementary zone to Beardsley. The Cansler Elementary zone, containing Beardsley, is separated from the Perkins zone by an interstate highway and railway interchange. For reasons of safety, these children must be bussed to Beardsley should they be assigned there. The County has no obligation to provide this bussing under the Local Sales Tax Agreement.

Because they were annexed from the County, Spring Hill and Alice Bell schools house grades 1–8 and do not feed into a junior high school. Since these schools zones have no black residents, at the junior high level these schools would be 100% white under the Stolee plan. Since these schools will not meet Dr. Stolee's definition of desegregated schools, his testimony that his plan would effectively desegregate the Knoxville schools is erroneous.

At present both the South and the Young High School plants house grades 7–12. Dr. Stolee would convert these schools to 9–12 senior high schools and send South Knoxville 7th and 8th graders to Vine Junior High. This change would compel the bussing of 1400 children across the Henley Street Bridge, on the most congested traffic artery in Knoxville (Chapman Highway) and through the crowded central business district at peak traffic hours. This would require twenty-four 60-passenger bus loads twice each day. In addition, fourteen 60-passenger bus loads of elementary children would have to take the same routes at about the same times twice each day. If Dr. Stolee's assumption that 25% of these children will obtain their own transportation is correct, the traffic problem will only be compounded. Some of these children can expect to spend over two hours each day commuting.

The other junior high schools with non-contiguous zones are Gresham and Bearden. Some 300 youngsters would have to be moved from Fair Garden 8.8 miles to Gresham in extreme North Knoxville (Fountain City). Some 160 would have to be moved from Maynard 6 miles west to Bearden Junior High.

Doctor Stolee testified that his proposed Tyson Junior High School zone would not require transportation. Moses Elementary School, which is zoned to Tyson in the Stolee plan, is 1.8 miles from Tyson. Children from the Moses zone

road routes from Inskip to the rest of the proposed zone.) Inskip children would have to travel at least a mile through oth-

er zones before they could reach the Whittle Springs-Christenberry zone.

must cross under the interstate highway at one of its most heavily used exits which provides direct access to the University of Tennessee. These distance and safety factors make bussing from Moses to Tyson highly advisable if not necessary under the Stolee plan. There are similar needs for limited bussing in the Rule Junior High and the Park Junior High zones proposed by Dr. Stolee because they encompass residental areas that are accessible only by dangerous routes.

On the senior high school level, the Stolee plan has three non-contiguous zones: Bearden draws from Maynard (10 miles), Central draws from Fair Garden (10 miles), and Fulton draws from Eastport (3.2 miles). He stated, in effect, that 562 senior high students would have to attend school outside their neighborhood zone.

The Stolee plan's proposed zone lines for West High eliminate portions of the present West zone that are receiving transportation from the County under the Local Sales Tax Agreement. Further, the proposed West zone encompasses the present Cansler and Moses Elementary zones. The latter schools are 5.4 miles and 4.6 miles, respectively, from West. Dr. Stolee's testimony that no additional transportation would be required in the West zone is clearly incorrect.

After careful study of the Stolee plan, we are convinced that Dr. Stolee grossly understated the actual amount of bussing and the distances involved in his plan. The many serious oversights in his plan and his failure to utilize the pupil locator data prevent his plan from serving as a workable alternative to the Board's plan. It is evident that Dr. Stolee did not devote the time to his plan necessary to do a professional job. This failure combined with his manifest interest in this type of case seriously undermines his credibility as an expert witness. If implemented his plan would disrupt the Knoxville School system and the lives of parents and children in many households.

In addition to the patent weaknesses in the Stolee plan, Dr. Bedell pointed out some of the shortcomings of the plan. A number of these are significant. They are as follows:

(1) The plan discriminates against black high school students without private transportation who are bussed out of their neighborhoods and who want to participate in after-school extra-curricular activities such as athletics.

(2) The plan did not consider plant capacity. It would require one hundred additional classrooms at some schools while underloading others.

(3) Implementation of the plan would require legal arrangements between the City Board of Education, the County Board of Education, the City Council, the County Court and the State Department of Education. Negotiation of these arrangements could take many months.

(4) By removing the ninth grade from certain junior high schools, the plan deprives these schools of state funds for guidance counselors.

### Faculty and Principal Assignments

Faculty employment is based on the applicant's qualifications and the system's need for special skills. There is no position in the system for which race is a consideration. A large number of black teachers have been hired over the past few years. However, there is a shortage of black elementary school teachers.

The Board's resolution of July 26, 1971, to assign teachers to achieve a racial balance in each school consistent with the ratio for the system as a whole was accomplished by transferring some 180 teachers. On the elementary level this was accomplished by lottery.

Subject area certification of teachers prevented assignment by lot on the senior high level. These assignments were made by Dr. Bedell's office. Shop instructors, athletic instructors and band directors were sheltered because their skills are in short supply and their programs for the 1971–72 school year were already underway. Consequently, at the senior high level only academic instructors were considered for reassignment. Some experienced English teachers at Austin-East

were sheltered because otherwise that school would have no English teacher with more than two years' experience.

Beardsley is the only school in the system without a study hall. This requires a unique teaching assignment at that school that, in turn, prevented achievement of the desired racial ratio at that school. Vine gets a large number of welfare pupils from low income housing projects in its zone. Some of its teachers were sheltered because of their skill in student control.

For these reasons, the desired faculty ratio has not been achieved at some schools. Dr. Bedell's office is continuously trying to correct these imbalances as rapidly as possible without damaging the continuity of the departmental program in any school. Some improvement has been made since the chart was made. Dr. Bedell testified that the faculties of each school in the system, except three, are within two faculty members of having a racial balance identical to the overall faculty composition for the entire school system.

The defendant's principal hiring practice is to promote from within. All faculty and principals receive the superintendent's newsletter where all vacancies are advertised. Those interested in a specific vacancy must apply for the position.

Under a private tenure act, a principal's salary is tied to the size of the school he supervises. If there are no vacancies at schools with the same classification, he may be locked into a particular school. When a principal is transferred to a school at a lower classification, the act requires that his salary be maintained at the higher level. This situation has obvious inequities.

Austin-East had a white principal until last year when he requested a transfer. Since only blacks applied for that vacancy, it is now held by a black. No black applied for the recent vacancy at Holston. Until it was closed, Bell House school had a predominately white student body and a black principal. Fair Garden has a white principal and a predominately black student body. Blacks have refused offers of principalships at predominately white schools.

In the opinion of the Court the faculty of each school in the system is effectively desegregated.

*Transfer Policy*

Lewis Howard, a Knoxville attorney and member of the defendant Board of Education, testified that the transfer policy is a problem throughout the system because of frequent unhappiness with individual school situations unrelated to race. Dr. Fred Bedell, Assistant Superintendent in Charge of Personnel and Development, testified that one of the past abuses of the transfer system has been its use as a disciplinary threat. He said that majority-to-minority racial transfers are now a matter of right. The Board is encouraging them and will provide bus fare to these transferees. No child is excluded from any school for reasons of race.

Defendant has made its transfer records available to the plaintiffs. Dr. Bedell gave a group of parents permission to inspect the transfer records. They informed counsel for plaintiffs that although they had conducted only a partial check, they had found thirty-four non-vocational transfers from Austin-East for this school year. Dr. Bedell's staff verified thirty-one of these transfers. Because the present transfer policy was adopted in July, 1971, it is possible that these transfers for the 1971–72 year were approved before that date. Apart from this partial check by third parties, plaintiffs made no effort to introduce any competent evidence relating to the Board's transfer policy. There is no credible evidence that the Board's transfer policy is being used to promote segregation.

The Board introduced copies for the transfer requests from Austin-East for the past three school years. Dr. Stolee testified that these requests demonstrated that the transfer system had been used to promote segregation. These requests do not indicate the applicant's race, and the bulk of them are checked

"disapproved." It is not understood how Dr. Stolee could reach his conclusion from this exhibit.

### Extra-Curricular Activities

The extra-curricular activities in the City schools are widely varied but chiefly are athletic or musical. Participation is on the basis of interest and ability. There are no racial restrictions in extra-curricular activities. There is athletic competition between predominately black schools and predominately white schools. Obtaining minority race cheerleaders at mixed schools has been a matter of recent concern. Last spring the Board took action to assure minority representation.

### The Building Program

Of classrooms with no specific program assignments, there are forty-eight vacant regular classrooms. These occur in South Knoxville and the inner city. They are in buildings built in former population centers of the City that have experienced a steady out-migration to the suburbs. These areas do not have the population density they once had. Enlargement of these zones will not help because it merely reduces the size of the adjacent zone, thereby passing the vacancy problem to the next school. This is the reason many special programs are located in inner city schools. There are two alternative solutions to the problem. Some inner city schools can be abandoned and new ones built at more appropriate locations. This would require voter approval of a bond issue. Or, the City could establish a transportation system to haul children in from the overcrowded suburban schools. The City does not have funds to establish such a system. Under the terms of the Local Sales Tax Agreement, County transportation in the annexed areas is not available for bussing children to the inner city schools.

The new Central High was completed and opened at the beginning of this school year. It is located one-half mile east of the old Central High. The new building was necessitated by the condition of the old plant. It is in an annexed suburb and cost $5,000,000.00. The old Central plant is now Gresham Junior High.

The new Bearden High was built to replace the old plant which had many portable classrooms. It is in an under-developed, rapidly growing area that needed and still needs additional classroom space. It also serves some 400 County students. The old Bearden plant has been filled with some 1000 junior high pupils. The elementary schools in the area, Rocky Hill and West Hills, are overcrowded and use portable classrooms. The new Bearden High plant made possible the creation of a separate junior high at the old plant. They are in the annexed suburbs.

Northwest Junior High School was constructed to relieve the pressure on its feeder elementary schools which had continued to serve grades 1 through 8 since their annexation from the County. It serves annexed suburbs.

The new Sarah Moore Green School, now under construction, is intended to replace Robert Huff and relieve the pressure on Fair Garden and Eastport. Robert Huff is now at capacity. Eastport and Fair Garden are overcrowded. The reasons the Green School is not used to relieve this overcrowding are that special programs decrease the space actually available there, and Green's inaccessibility creates problems.

Mr. Lewis Howard testified that the Board has considered site selection as a means of desegregation. Their policy is to build schools where the children live in order to avoid constructing a "white elephant." Areas where few children live are threatened with changes rendering them unsuitable for schools and which may compel abandonment of school facilities. Schools in areas that are losing population can be fully utilized only if children are transported to them from other areas. The Board does not have a transportation system nor does it have funds to acquire one.

He further testified that existing school facilities are located between recently constructed suburban schools and the interior schools where black children

live. The latter are not operating at capacity; adjacent schools are at capacity; and the peripheral suburban schools are overcrowded. Under these circumstances, the Board feels a priority obligation to build schools in the suburbs to relieve overcrowding there. Until all children have adequate classroom space, site selection cannot be used effectively to increase integration.

The Board has not used school site selection or school abandonment to promote or perpetuate segregation.

### Bussing

Investigation disclosed that creation of a racial balance in each school approximating the ratio for the system as a whole would require bussing 8,000 to 10,000 children in eighty buses. If the pick-up points were the childrens' homes the annual cost will exceed $500,000.00. If the pick-up points are neighborhood schools the annual cost will exceed $300,000.00. The Board does not own any buses or any bus maintenance facilities.

The City school system is facing a serious financial crises. It has recently experienced large deficits in its operating budget and realistically anticipates another large deficit this fiscal year. The system has exhausted available revenue sources and stands to lose additional state and county funds because of continuing enrollment decline. Board Member Lewis Howard testified that the Board is not able to provide a proper instructional program with current budgetary limitations. Since 90% of the Board's budget is consumed as salary costs, the creation of any new programs or projects without independent funding would necessarily reduce the faculty size and further reduce the quality of education offered the children.

### Swann Distinguished

This case has been remanded for reconsideration in light of Swann and its companion cases. An examination of the Swann opinion reveals several important factual differences from our case.

Goss was commenced in 1959 and Knoxville began to desegregate in 1960–61. Prior to that time Knoxville used a neighborhood pupil assignment system and has, with Court approval, continued to do so. Knoxville does not have a pupil transportation system. Knoxville permits only vocational and majority-to-minority racial transfers. In contrast, Swann was not commenced until 1965. Prior to that time, Charlotte had a large pupil transportation system [12] and did not purport to assign pupils on the basis of geographically drawn zones. Charlotte's 1965 desegregation plan instituted geographical pupil assignment for the first time and at the same time allowed almost unlimited transfer privileges. Cf. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

In 1967, we held that Knoxville had been operating a unitary system since 1964–65. That decision was affirmed by the Court of Appeals in 1969. In 1970, we held that Knoxville had maintained a unitary system within the meaning of Alexander since 1967. In contrast, all parties in Swann agreed that in 1969 the Charlotte-Mecklenburg system fell short of achieving the unitary system required by prior cases. In 1969, Charlotte had segregated athletic competition, a segregated school transportation system and a racially segregated faculty. Knoxville has none of these characteristics.

### Conclusions of Law

█ The great preponderance of the evidence shows, and the Court finds, that defendant has continued to comply with the constitutional guidelines previously approved by this Court, the Court of Appeals, and the United States Supreme Court. The entire thrust of plaintiffs' evidence and argument is to the effect that the Constitution requires defendant

---

12. Prior to the District Court's bussing order, Charlotte bussed 23,600 pupils at all grade levels daily an average of 15 miles one way for an average trip of over an hour. 402 U.S., at 30, 91 S.Ct. 1267, 28 L.Ed.2d 554.

to create and maintain a nearly identical racial balance in each of its schools irrespective of residential patterns. Thus, the case having been remanded for reconsideration in light of *Swann*, the critical question is whether *Swann* requires such racial mixtures.

The opinion in *Swann* contains a statement that is clearly responsive to that question:

"... If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. *The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.*" (Emphasis added) 402 U.S., at 24, 91 S.Ct. at 1280.

Although that statement refutes plaintiffs' argument, it does not disclose the standard defendant must meet. That standard is expressed at other points in the opinion:

"Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; *it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.*" (Emphasis added) 402 U.S., at 23, 91 S.Ct. at 1279.

The Knoxville School Board has not excluded any pupil from any school, directly or indirectly, on account of race. Knoxville's residential segregation has contributed "to disproportionate racial concentrations in some schools," but this is not the fault of the School Board.

We do not interpret *Swann* as invalidating the neighborhood pupil assignment system.

"At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in *Brown I*. The systems will then be 'unitary' in the sense required by our decisions in *Green* and *Alexander*." 402 U.S., at 31, 91 S.Ct. at 1283.

Earlier the opinion refers to *Green* as holding:

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II*. That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S., at 437–438, [88 S.Ct. 1689, at 1694, 20 L.Ed.2d 716.]" 402 U.S., at 15, 91 S.Ct. at 1275.

It should be recalled that in *Green* there were two separate systems in operation despite residential integration.

■ The *Alexander* definition of a "unitary system" is best identified by Chief Justice Burger's statement in his concurring opinion in *Northcross v. Board of Education*, 397 U.S. 232, 236–237, 90 S.Ct. 891, 893, 25 L.Ed.2d 246 (1970):

"The suggestion that the Court has not defined a unitary school system is not supportable. In *Alexander* . . . we stated, albeit perhaps too cryptically, that a unitary system was one 'within which no person is to be effectively excluded from any school because of race or color.'"

Another indication of the constitutional standard appears earlier in the opinion.

"The constant theme and thrust of every holding from *Brown I* to date is that state-enforced separation of races in public schools is discrimination that violate[d] the Equal Protection Clause. The remedy commanded was to dismantle dual school systems." 402 U.S., at 22, 91 S.Ct. at 1279.

As indicated by these quotations, the standard to be achieved by school authorities is the destruction of a system which treats children differently solely on the basis of race.

No child is excluded from any school in the Knoxville school system because of his race or color. Thus, the Knoxville system is a unitary system within the meaning of *Alexander*. As Knoxville school children are assigned to schools on the basis of their residence and without regard for their race, the system is not a dual system as was defined in *Green*. Disproportionate racial mixtures in some of the Knoxville schools are the result of residential patterns. *Swann* is clear that the school authorities are not expected to prevent different treatment of the races outside the schools. 402 U.S., at 22–23, 91 S.Ct. 1267, 28 L. Ed.2d 554. The racial composition of the Knoxville schools is not the result of present or past discriminatory action upon the part of the School Board. Knoxville is in compliance with *Swann*. Accordingly, Knoxville is operating a unitary school system consistent with constitutional requirements.